[Civ. No. 17512.   Second Dist., Div. Two.   Dec. 28, 1950.]

MERLE M. ALLEN, Respondent, v. J. GORDON HUSSEY et al., Appellants; COUNTY OF LOS ANGELES, Intervener.

COUNTY OF LOS ANGELES, Respondent, v. J. GORDON ·HUSSEY et al., Appellants.

Bouchard & Brown for Appellants.

Harold W. Kennedy, County Counsel, John B. Anson, Deputy County Counsel, I. Henry Harris, Jr., and Robert J. Magdlen for Respondents.

WILSON, J.—The question presented in this action concerns the validity of leases made by Palmdale Irrigation District and two individuals to defendant J. Gordon Hussey covering the airport and adjacent property located within the district. Three actions involving the validity of such leases were consolidated and tried together: (1) An action by Merle M. Allen as a property owner within Palmdale Irrigation District against Hussey, the district and its board of directors to void a lease made by the district to Hussey; (Shortly after the action was filed the county of Los Angeles acquired title to the property covered by the lease and the district's interest in the lease and intervened in the action.) (2) an action by Ruth M. Jones to cancel a lease given by her to Hussey covering property adjacent to the airport; (The county of Los Angeles subsequently acquired the plaintiff's title and was substituted in the action.) (3) an action by the county of Los Angeles to cancel a lease of other property adjacent to the airport from one Van Buskirk to Hussey.

At the outset it should be said that the court found that in all transactions relating to the airport and the leases thereof the board of directors of the district and Hussey acted in good faith and were not guilty of fraud or concealment.

The court declared that the lease from the district to Hussey was void as constituting a gift of public funds to him, that Hussey had previously disclaimed any interest in the Jones and Van Buskirk properties, that he had become a party to the latter leases merely as an accommodation to the district and that the district was the real party in interest under both.

A consolidated judgment was entered adjudging that all the leases are null, void and ineffective for any purpose and decreeing that they be cancelled. Hussey and wife have appealed on an agreed statement and the judgment roll.

The board of directors of the district requested Hussey to assist them in securing the development of the airport and he, in 1941, began negotiations with the federal government to have the emergency landing field enlarged as a Works Progress Administration project with Palmdale Irrigation District as the sponsor.

In March, 1941, the board of directors instructed the secretary of the district to file an application with WPA* to construct an airport as proposed by plans prepared by the district. Hussey met with the board and made certain representations with regard to working on that project and other projects connected with it. In 1941, upon application of the district as sponsor, the federal government made available funds for the construction of the airport. In July of that year the board approved leases and resolutions pertaining to the proposed airport, the leases to the district having been for a period of 35 years as follows: (a) Goodhue lease covering 140 acres at a rental of $275 a year; (b) Van Buskirk lease covering 87.7 acres at $3.00 an acre; (c) Jones lease, 57.8 acres at $3.00 an acre; (d) Hinkley lease, 60 acres at $5.00 an acre, with a one year's option to purchase for $4,190.21. In January, 1942, the district purchased the Hinkley property for the price named in the option.

On the date the above mentioned leases were approved by the board of directors they were informed that Van Buskirk and Jones had also executed and placed in escrow leases to Hussey covering additional property adjacent to the airport.

At the same time an agreement was accepted by the district whereby Walberg-Dozier Company agreed to sell the district certain lands adjacent to the airport on condition that the district acquire "sufficient title" to the property owned by Jones, Van Buskirk and Goodhue, and that the development of the property be approved by a government agency. The consideration for the Walberg-Dozier property, which consisted of 300 acres, was the issuance of tax receipts amounting to $864.25 and the exchange of other district lands valued at

---

*The initials WPA will be used hereinafter to refer to Works Progress Administration.

approximately $10,000. In January, 1942, the district acquired the Walberg-Dozier lands.

The board of directors then accepted a proposed agreement between the district and Hussey whereby the district agreed to sublease to Hussey two parcels of land containing 28.05 and 7.89 acres, respectively, which were included in the Goodhue lease but outside the boundaries of the airport as laid out at that time; the agreement also provided that within 10 days after Hussey had acquired by lease from Hinkley certain other properties Hussey would assign the property to the district. All the Hinkley property was subsequently purchased by the district.

At the same time a lease of the airport dated July 11, 1941, was executed by the district to Hussey providing that in the event the district held the property comprising the airport, or any of it, under lease Hussey would pay directly to the lessor the amount the district was required to pay under such lease, and if the district bought the property Hussey would pay as rent 4 per cent of the amount expended by the district. This agreement was cancelled in November, 1941, at the request of the United States Government.

The board next executed an agreement with Hussey providing that since Hussey had expended much time, energy and money to facilitate the development of the airport, and would continue to do so, and the district would benefit thereby, the latter made Hussey its sole and exclusive agent for the sale of property in the district; and for all lands sold with certain exceptions, whether by Hussey or by the district, the district would receive $150 an acre and the balance would go to Hussey.

Next the directors leased to Hussey five parcels of property acquired from Walberg-Dozier Company, such lease being for a period of 35 years and becoming effective when the district acquired the land, the consideration for the lease being $10 and services rendered. Subsequently Hussey acquired one of the five parcels consisting of 41 acres for $10 an acre.

All the foregoing leases and agreements were authorized by the board to be placed in escrow and to be released when WPA announced its readiness to proceed with the improvement.

The district then authorized Hussey to go to Washington and represent it in negotiating with public or private agencies for the development of the airport. Hussey carried on the negotiations with the federal government and was largely instrumental in securing federal aid for that purpose. In

August, 1941, pursuant to the plan for the airport, the board of directors filed a master proposal for federal aid.

In December, 1941, the directors authorized the secretary of the district to send, and he did send, a notice to the bond-holders of the district concerning a plan to purchase approximately 340 acres upon which the district had secured the options at the meeting of July 10, 1941. In order to provide land for the airport the notice proposed that the bondholders surrender certain interest-bearing coupons maturing July 1, 1939, to and including January 1, 1942, for noninterest-bearing registered warrants in an amount of 50 per cent of the face value of such coupons surrendered, payable January 1, 1947. Such plan was accepted by bondholders who surrendered their interest-bearing coupons of a total face value of $28,925 in exchange for registered warrants. The sum of $10,444.14 of bond interest-fund money was deposited in January, 1942, in a special airport account and subsequently was spent by the district in improvement and acquisition of land for the airport site.

The land for the airport was acquired partly by purchase by the district, partly by leases in the name of the district, and, for the purpose of providing adequate clearances outside the airport, Hussey took some leases directly from the property owners. Included in such purchases was the property described in the Hinkley lease for which the district paid the above mentioned sum of $4,190.21 from the bond interest-fund money deposited in the special airport account. The balance of the lands acquired by the district were obtained by lease, one of them being the Jones lease. The remainder of the Jones property necessary to allow clear approaches was leased by Jones to Hussey. On June 28, 1941, and as a part of one transaction for the purpose of acquiring the entire Jones property for the district as a part of the airport site, Jones simultaneously entered into separate agreements with the district and Hussey whereby approximately 57.8 acres were leased to the district and 98.8 acres to Hussey. The terms of the leases are identical, being for a period of 35 years at an annual rental of $3.00 an acre. On the same date and as a part of one transaction and for the same purpose, the Van Buskirk property was acquired through separate agreements whereby 87.7 acres were leased to the district and 72.3 acres to Hussey. Each lease was for the period of 35 years with an annual rental of $3.00 an acre. The Jones and

Van Buskirk leases to Hussey were cancelled by the consolidated judgment in these actions.

The leases from Jones and Van Buskirk were executed by Hussey only as nominal lessee for the purpose of protecting for the district the aerial approach clearances and were taken in the name of Hussey rather than in the name of the district because of the provisions of section 24253 of the Water Code, which requires the approval of the California District Securities Commission of leases that are within the terms of that section.

On January 19, 1942, Hussey entered into a management contract with the district which was approved by WPA under the terms of which Hussey was to receive 75 per cent of the gross profits and Palmdale Irrigation District 25 per cent thereof.

In March, 1942, a proposal and application to WPA was executed on behalf of the district and filed with the federal agency. This proposal was supplemental to the master proposal of 1941, and by its terms provided that if the proposed work should be undertaken by WPA the district would take over the project when completed and operate and maintain the field as aviation facilities in the interest of the public, that the work would constitute a useful public project and the facilities constructed or improvement thereunder would be operated and maintained by the sponsor in the public interest.

Pursuant to the applications above mentioned WPA expended approximately $500,000 for the development of the Palmdale airport prior to December 30, 1943, the date of the lease from the district to Hussey, which is in question in these actions. After that date the United States War Department and Civil Aeronautics Authority expended an additional sum of approximately $1,000,000 for the development of the airport.

On June 1, 1942, the War Department demanded and received possession of the entire airport, including the properties leased to Hussey. All the leases to the government ran for the duration of the war and six months thereafter, for which an annual rental of $1.00 was paid to each lessee. The leases to the United States covering the Jones and Van Buskirk properties were approved by the respective owners. The leases to the United States have never been terminated, but the government has released to the irrigation district the operation and management of the airport.

In April, 1943, pursuant to request of CAA,* the directors of the district passed a resolution decreeing that public convenience and necessity required the district to acquire fee title to the Jones, Van Buskirk and Goodhue properties. In conformity with that resolution a condemnation action was filed in May, 1943, and carried through but within the time provided by law the district filed a written notice of abandonment. In that action Hussey and his wife, who were named as defendants, signed and acknowledged a disclaimer in which they disclaimed "any right, title, or interest in or to the land sought to be acquired by plaintiff in the above entitled action, and waive any award of damages in said action."

During the trial of the condemnation action the attorney for the district testified that he asked Hussey if he would be willing to waive his right to any award in the condemnation proceeding and Hussey agreed; that thereafter the attorney prepared a document for Hussey's signature which was the disclaimer above mentioned. Hussey testified that he signed the document prepared by the attorney and delivered it to him for the sole purpose of waiving the right of defendants Hussey to any part of the award made in the condemnation proceedings.

Subsequently judgments totaling $5,600 were entered against the district in the condemnation action for costs and attorneys' fees incurred therein. Hussey deposited in such action $2,680 as a deposit to allow the district to take immediate possession. Upon the abandonment of the action those funds were paid to defendants other than Hussey and none of such funds have been repaid to him.

On June 22, 1943, the directors of the district adopted a resolution entitled "Resolution Constituting Agreement with the United States Relative to Operation and Maintenance of Palmdale Airport," which is referred to in the record and will be hereafter referred to as the AP-4 Resolution. Thereafter, at the suggestion of CAA, the Palmdale Irrigation District cancelled the management contract previously executed with Hussey and submitted to CAA, in October, 1943, a proposed lease from the district to Hussey providing for a rental of 4 per cent of the gross receipts from the operation of the airport. This document was not executed by either party and was disapproved by CAA for the reason that it was not subordinated to the AP-4 Resolution relative to the operation

---

*Civil Aeronautics Authority will be hereinafter referred to as CAA.

and maintenance of the airport. The proposed lease was redrafted, approved by CAA, and executed by the district and Hussey. This instrument is the principal subject of this litigation and is one of the leases held void and cancelled by the judgment in the consolidated actions from which the present appeal comes. The lease was for a term of 34 years at a rental of $1.00 a year during its term or any extension thereof. Hussey was given the option to renew or extend the lease for an additional term of 35 years.

In December, 1945, the United States returned the control, operation and management of the airport to Palmdale Irrigation District under an interim permit requiring the property to be operated as a public airport without unjust discrimination and without granting exclusive right for the use of the property within the meaning of section 303 of the Civil Aeronautics Act of 1938.

Also in December, 1945, under his lease and the above mentioned interim permit from the United States, Hussey went into possession of the airport and occupied it until November, 1947, when possession and operation were taken over by the county of Los Angeles.

Prior to November 5, 1947, Ruth M. Jones, plaintiff in one of the actions now on appeal in which county of Los Angeles was substituted in her stead, and Van Buskirk, grantor and assignor of the county of Los Angeles, and Palmdale Irrigation District divested themselves of all interest in the lands and improvements of the airport and of their interest in the leases by conveying the same to the county of Los Angeles, since which date no other person or entity has had any interest in such lands or leases except county of Los Angeles and Hussey, who claims an interest under his lease from the district.

In November, 1947, the county of Los Angeles filed an action in eminent domain to condemn the land and leases of the Palmdale Airport, in which action Hussey, who was a defendant, stipulated that the county of Los Angeles take over the operation and maintenance of the airport pending trial of the condemnation action. That action had not been brought to trial at the time of the trial of the cases before this court. From November, 1947, to October, 1948, the county had expended for maintenance, labor and improvements $18,000 and had received from services, charges and gas sales $6,209.56.

The agreed statement upon which the appeal is taken sets forth that the board of directors in all the foregoing trans-

actions with Hussey acted upon the advice of their counsel and in the manner they believed to be lawful and proper; that by the transactions and agreements they undertook to accomplish a project which in their judgment would contribute to the general welfare of the district and of its residents and property owners and that they exercised their honest judgment in entering into such leases and agreements.

Defendants maintain the lease from the district to Hussey is authorized and is valid by reason of the provisions of section 22437 of the Water Code which reads: "The title to all property acquired by a district is held in trust for its uses and purposes. The district may hold, use, acquire, manage, sell, or lease the property as provided in this division."

An irrigation district is an agency of the state and its functions are exclusively governmental. It owns no lands in a proprietary sense; its property is owned by the state and held only for governmental purposes. (*Anderson-Cottonwood Irr. Dist.* v. *Klukkert*, 13 Cal.2d 191, 197 [88 P.2d 685]; *El Camino Irr. Dist.* v. *El Camino Land Corp.*, 12 Cal.2d 378, 383 [85 P.2d 123].) In *Clough* v. *Compton-Delevan Irr. Dist.*, 12 Cal.2d 385, 388 [85 P.2d 126], it is said that by section 29 of the Irrigation District Act (now Water Code, § 22437) the property of the district is impressed with the public use and the trust is for all the purposes of the act; it is an active trust for public uses and purposes and to permit a partition of the land which constitutes the corpus of the trust would mean the destruction of the trust in violation of the statute. The same consideration of policy forbids the leasing of the property for 34 or 69 years at a rental of $1.00 a year. The owners of the property within the district are beneficiaries of the trust and their interests are to be protected along with those of the bondholders and general creditors.

"If the trustee in breach of trust transfers trust property to a person who takes with notice of the breach of trust, the transferee does not hold the property free of the trust, although he paid value for the transfer." (2 Restatement, Trusts, § 288, p. 878.) In the comment following the text of the section it is said that the interest of the beneficiary of the trust property is not cut off by the trustee's transfer in breach of the trust to a third person who has notice that the transfer is in breach of trust, although he paid value for the transfer, and the beneficiary can in equity compel the third person to restore the property to the trust.

The foregoing rule is applicable whether the breach of trust

is intentional or negligent or results from misinterpretation of the trust instrument. ■ Hence although in the instant case the court found that the board of directors of the district acted in good faith and on legal advice, the transaction was a breach of the trust and the property may be recovered at the suit of the district or of a property owner therein. ■ Hussey had notice of the trust since he is presumed to have known the law as expressed in the statute and as construed by the courts.

''If the trustee in breach of trust transfers trust property and no value is given for the transfer, the transferee does not hold the property free of the trust, although he had no notice of the trust.'' (2 *Idem*, § 289, p. 879.) Even though the legal advice received by the board of directors and by Hussey indicated to them that they were free to enter into the lease and such advice could be construed to mean that Hussey had no notice of the trust the transaction was nevertheless void because it was in violation of the trust created by the statute.

■ Section 181 (1 Restatement, Trusts, p. 466) is to the effect that it is the duty of the trustee to use reasonable care to make the trust property productive. Section 189 (p. 494) states that the trustee can properly lease trust property for such periods and with such provisions as are reasonable. ■ The WPA had expended $500,000 in the improvement of the airport; the district paid approximately $25,000 for the acquisition of land and cancelled a contract whereby it was to receive 25 per cent of the gross income from the operation of the airfield; it was to receive under the lease $1.00 a year for 34 and possibly 69 years. Expenditures of the district consisted of $10,000 from the bond interest-fund, $10,000 in the land exchange with Walberg-Dozier Company, $5,600 for costs and attorneys' fees in the abandoned condemnation suit. The authorization for such a lease by the board of directors was in violation of their duties as trustees of a public trust even though they acted in good faith and on legal advice, hence such purported lease did not vest in defendant Hussey any right or interest whatsoever in the airport. ■ The purported lease was made in violation of the WPA Sponsor's Agreement which contains the following provisions:

(a) ''It is certified that the work set forth in this proposal will constitute a useful public project, that the facilities constructed or improved thereunder will be maintained and

operated by the Sponsor in the public interest, and that no agreement, express or implied, has been or will be entered into whereby any land, building, structure, facility, or any part of the proposed work will be transferred, sold, leased, or otherwise disposed of to a nonpublic agency or private individual, with the following exceptions: (If not so state.) No Exceptions.''

.   .   .   .   .   .   .   .   .   .   .

(b) ''Disposal or Leasing of Property: It is not contemplated that public property to be improved by this project will be leased, sold, donated or otherwise disposed of to a private individual or corporation, or quasi-public organization during the useful life of the improvements to be placed thereon under this project.''

On the faith of the express promises made by the board of directors of the district, WPA expended $500,000 in constructing runways and other improvements on the airport. The purported lease to Hussey was directly contrary to the quoted portions of the agreement which induced WPA to make its large expenditures. At the date of the execution of the supplementary agreement with WPA, March 6, 1942, the original lease to Hussey of July 11, 1941, had been cancelled at the request of the government and the operating agreement was in force—but no lease. As indicated by the above quotations it was the manifest purpose and intent of WPA that the airport should not be leased and its expenditure of its funds was on the warranty of the district that it would not be leased.

Section 22142 of the Water Code authorizes an irrigation district to ''sponsor any project undertaken by the United States for the improvement of land for airport or aviation school purposes or both.'' That section and section 22140 are in the article of the code entitled ''Airports and Aviation Schools.'' Section 22140 provides that ''This article applies only if all of the following are true: . . . (b) The United States agrees to improve or contribute money for the improvement for airport or aviation school purposes or both of the land proposed to be used.'' The district was without power to sponsor the project unless the government improved the airport or contributed funds for the improvement.

Section 22144 reads: ''A district may accept the appropriation of any funds by the United States for the improvement of the land for an airport or aviation school on any conditions

imposed by the United States if the use of the airport for commercial purposes is not thereby precluded.'' The United States was at liberty to impose on the district such terms as it deemed necessary and proper as conditions precedent to undertaking the construction of the airport and by reason of the provisions of the Water Code the district was without authority to accept funds from the government or to sponsor an expenditure unless it accepted the government's terms and requirements. Among them was the district's guaranty that no part of the facility had been or would be leased ''to a non-public agency or private individual, . . . No exceptions.''

■ The district accepted the conditions required by WPA and was without power to execute the lease in contravention of such conditions.

■ Defendants' contention that the redrafting of the lease at the request of CAA and its approval by that governmental agency validated the transaction is not tenable. The lease was void because it was in violation of the district's agreement with and guaranty to WPA which was in full force and effect. The latter agency had expended funds that were within its exclusive control upon the warranty of the district that there would be no lease. WPA did not consent to the lease. It would be an anomalous situation if one governmental agency could determine the conditions under which it would expend funds under its control and for which it was responsible and refuse to allot money unless the sponsor of the project agreed to the conditions thus imposed, and upon the completion of the work another agency would have power to annul the agreement by waiving any or all the provisions of a contract to which it was not a party. Such a paradoxical situation could result in nothing but uncertainty and chaos in government, since if one agency should overrule the act of another, still a third could annul the second and reaffirm the first, in consequence of which a contract would be in force today, void tomorrow and restored on the day after.

Manifestly CAA was interested in only one matter, to wit, the subordination of the lease to the AP-4 Resolution. This was the agreement under which CAA undertook to do additional work on the airport. The first draft of the lease was not executed by Hussey and was disapproved by CAA because of AP-4. A redraft in which the lease was subordinated to AP-4 was approved by CAA. It does not appear from the record that CAA gave any consideration to the sponsor-district's contract with WPA nor to the provisions of the

Water Code which were the sole authority for the district to enter into the WPA agreement. Defendant does not contend that CAA had authority to annul the Water Code.

The lease itself recognizes the paramountcy of the WPA Sponsor's Agreement. It provides in section 15: "This lease shall be subordinate to the provisions of any existing or future agreement between the District and the United States, relative to the operation or maintenance of the airport, the execution of which has been or may be required as a condition precedent to the expenditure of Federal funds for the development of the airport." When the lease was executed the Sponsor's Agreement had already been executed which forbade such a lease.

The WPA agreement provided that "In consideration of the expenditures to be made from Federal funds on this project . . . District will take over the work when completed and operate and maintain it as aviation facilities in the interest of the public." It cannot be reasonably contended that it is in the public interest to permit a lessee to operate the airport costing a half million dollars for his private gain, paying rental of only $1.00 a year.

The lease contains an assignment to Hussey of all proceeds of a sale or other moneys that might be received for the airport from the Army or Navy or any governmental agency, including WPA, if such agency should take over or acquire the leased airport, excepting only such moneys as would be needed to refund to the district its own investment plus 4 per cent interest from the date of expenditure. No reason has been made to appear as to why such donation to Hussey should have been attempted.

Defendants contend that the prohibition in the WPA agreement against leasing is a "statement of present intention rather than a warranty." There is no elaboration in the brief of such contention and no argument in its support. It is without merit. It will not be assumed that WPA would undertake the expenditure of so large a sum of money on a mere "present intention" that would be subject to change by the directors of the district as soon as the work had been completed.

The lease was contrary to the spirit and intent of the Emergency Relief Appropriation Act pursuant to which WPA operated and made its expenditures. The act was intended to provide public works for the use and benefit of the public and not of private individuals. To assure this result the provision against leasing was inserted in the agreement. Since

it is against the policy of the law it is void. (*McAllister* v. *Drapeau*, 14 Cal.2d 102, 108 *ff*. [92 P.2d 911, 125 A.L.R. 800].) In that action an agreement to give a secret lien subordinate to the first lien of Home Owners' Loan Corporation was declared void, although the lien of the latter was not affected by the secret agreement or by the second lien. ██ Since the lease here in question is against the policy of the law as well as contrary to the sponsor's agreement it is no defense that WPA has not raised the question by appropriate litigation.

██ An irrigation district is a public corporation or agency and has only such powers as are given to it by the Legislature. ██ Its board of directors has no power to dispose of the district's property other than in the manner provided by law, and all contracts or purported contracts of the district which are beyond the scope of the power given by statute are void. (*Bottoms* v. *Madera Irr. Dist.*, 74 Cal. App. 681, 694-5 [242 P. 100].) Districts are subject to the provisions of Division 11 of the Water Code regardless of the date of their formation. (Water Code, § 20560.) Division 11 is the Irrigation District Law. (§ 20500.) ██ Section 22143 provides that no district shall incur an indebtedness for the improvement of an airport or aviation school sponsored by the United States "which can not be paid out of revenue to be derived from its airport or aviation school or the leasing thereof." In order to acquire land for the sponsored project the district incurred indebtedness (a) Jones, Van Buskirk and Goodhue leases, rental of $711.50 a year for 35 years; (b) Hinkley lease, rental at $300 a year (land purchased subsequently for $4,190.21); (c) judgment of $5,600 for costs and attorneys' fees in the condemnation suit; (d) Walberg-Dozier purchase for cancellation of tax receipts amounting to $864.25 and exchange of land valued at $10,000; (e) registered noninterest-bearing warrants for $14,500 resulting in the release of $10,444.14 subsequently used for acquiring and improving land for the airport site. Such warrants constituted an indebtedness. ██ Assessments collected by an irrigation district are public funds and not private property of the district. (*Perry* v. *Otay Irr. Dist.*, 127 Cal. 565, 567 *ff*. [60 P. 40].) Such funds cannot be expended for construction work without previous authorization by the voters of the district. (*Buschmann* v. *Turlock Irr. Dist.*, 47 Cal.App. 321, 324 [190 P. 491].) The arrangement with bondholders hereinabove referred to did not transmute the funds from their public character into that of private ownership of the district.

Hence by reason of the mandate of section 22143 the district was without power to incur an indebtedness that could not be paid out of revenue derived from the airport. The rental of $1.00 a year to be paid by Hussey obviously was insufficient to answer this requirement. Such sum was not just a nominal rental but was no rental at all for such a property.

But little need be said in addition to our previous comments concerning the lease to show that it is a gift to Hussey in violation of sections 22 and 31 of article IV of the Constitution of this state. He received, subject to certain limitations, (1) a lease of the airport (the leasehold is property), on which the United States government had expended $1,500,000 or more and the district had invested $25,000, for a term of 34 years or 69 years at his option; (2) the exclusive right, during the term of the lease, to manage, operate and control the airport for his own use and profit; (3) an assignment of all proceeds of a sale or other moneys that might be received by the district for the airport from the Army or Navy or any governmental agency, if such agency should take over the leased premises and make payment therefor (except only such amount as would refund to the district its own investment plus 4 per cent interest); (4) the right to assign the leases to any person for the purpose of managing and operating the airport, or to any association or corporation that might be created for such purpose; (5) the right to sublet any of the buildings or improvements, or any part thereof, on the property and to sublet the airport or any part of it. In return what did he give, or what was the consideration for all these grants and privileges? One dollar a year! Such consideration was to remain unchanged for 34 years in any event and for 69 years if Hussey should exercise his option for an extension. The requirement that he manage, operate, supervise and control the airport and maintain it in a good and serviceable condition was no more than any tenant is required by law to do. (Civ. Code, §§ 1928, 1929.) The lease provides that if Hussey does not maintain the landing area in repair the district may do so, but there is no provision for reimbursing the district for any expense it may incur for such purpose.

This is not a case, as contended by defendants, where the court "enters the boardroom" and substitutes its judgment for that of the board of directors of the district as to what is a proper consideration but is a situation in which there is

474

no consideration at all for the lease and it is the duty of the court so to declare. The fact that the board acts in good faith does not change the matter into one of consideration, adequate or inadequate, where there is an entire absence of consideration. While the airport was to be operated as a public landing field the profit from its operation was to go to Hussey and not to the district or any other public agency. The benefit was to Hussey, not merely incidentally, but it was the paramount element of the transaction.

Defendants maintain that a part of the consideration for the lease was the benefit to the district in having an airport in the locality. But the airport would have been there had there been no lease. When it was executed WPA had already expended a half million dollars in the development of the airport and the operating agreement was in force whereby Hussey was to manage the airport and the district was to receive 25 per cent of the profits derived therefrom. The substitution of the dollar-a-year lease for the operating agreement is a benefit—but to Hussey only and not to the district.

Moreover, a benefit to the district, if there had been such, does not furnish a consideration for the lease, especially when the facility was to be operated for the private profit of the lessee. (*Higgins* v. *San Diego Water Co.*, 118 Cal. 524, 547ff [45 P. 824, 50 P. 670].) Hussey's previous services in assisting in the procurement of WPA funds for the construction of the airport are not a legal consideration for the lease since the district had not contracted to pay for such services and therefore was under no legal obligation therefor. (*Conlin* v. *Board of Supervisors,* 99 Cal. 17, 24 [33 P. 753, 37 Am.St.Rep. 17, 21 L.R.A. 474]; *Molineux* v. *State,* 109 Cal. 378, 380 [42 P. 34, 50 Am.St.Rep. 49]; *Lamb* v. *Board etc.*, 29 Cal.App. 2d 348, 350 [84 P.2d 183].) Nor was Hussey's assumption of responsibility for the operation of the airport a consideration. If so any public agency would be able to circumvent the beneficent restrictions imposed by the Constitution by the simple expedient of bestowing responsibility upon a person and in return for his acceptance thereof donating public property to him.

Land adjacent to the airport was leased by Jones and Van Buskirk to Hussey at the same time they leased other lands to the district, as hereinbefore related, and as a part of the same transaction. The leases were made to Hussey "only as nominal lessee to protect for the district the aerial approach clearances," and were taken in his name, rather

than in the name of the district, by reason of section 24253 of the Water Code which requires the approval of the California Districts Securities Commission on leases that are within the terms of that section. Since Hussey was only nominal lessee and the district was the real party in interest, he had no personal, proprietary interest in the leases. If he ever had or claimed such interest he abandoned it. The first year's rental on both Jones and Van Buskirk leases was paid by the district. Hussey never paid any rent at all and the district did not pay after the end of the first year.

After the county of Los Angeles had acquired title to the airport and to the interest of the district in the leases it had a right to obtain their cancellation. Furthermore, Hussey and wife disclaimed all right, title and interest in the lands covered by the leases, hence have no cause of complaint against the judgment cancelling them.

The purpose of the reference to the testimony of the attorney for the district and of Hussey that the disclaimer was for the purpose of waiving Hussey's right to an award in the condemnation proceedings does not appear since the disclaimer is in plain and unambiguous terms, disclaiming any and all interest in the land, and Hussey does not contend that he could not and did not read it or that he did not understand its purport. He contends in his brief that the delivery of the disclaimer was conditional and was to be used only as a waiver of his right to compensation. The agreed statement does not so indicate and the trial court found against this contention.

Since the district's lease to Hussey is void *ab initio* for the reasons hereinbefore stated the passage of time did not validate it, hence the statute of limitations is not available as a defense. Such defense is likewise inapplicable in the action relating to the Jones and Van Buskirk leases inasmuch as Hussey never acquired any interest for himself in those leases and abandoned any nominal interest he may have had both by failing to pay rent and by disclaimer.

Judgment affirmed.

Moore, P. J., and McComb, J., concurred.

A petition for a rehearing was denied January 23, 1951. McComb, J., voted for a rehearing. Appellants' petition for a hearing by the Supreme Court was denied February 19, 1951. Schauer, J., voted for a hearing.