RICE ET AL. *v.* BOARD OF TRADE OF THE CITY OF CHICAGO.

NO. 471.

Argued February 14, 1947.—Decided May 5, 1947.

*Lee A. Freeman* argued the cause and filed a brief for petitioners in No. 471.

*William C. Wines,* Assistant Attorney General of Illinois, argued the cause for petitioners in No. 473. With him on the brief was *George F. Barrett,* Attorney General.

*Howard Ellis* argued the cause for respondent. With him on the brief was *Weymouth Kirkland.*

*Acting Solicitor General Washington, Assistant Attorney General Berge, Robert C. Barnard, W. Carroll Hunter* and *Lewis A. Sigler* filed a brief for the United States, as *amicus curiae,* urging affirmance.

Opinion of the Court by MR. JUSTICE DOUGLAS, announced by MR. JUSTICE BLACK.

These are companion cases to *Rice* v. *Santa Fe Elevator Corp.* and *Illinois Commerce Commission* v. *Santa Fe Elevator Corp., ante,* p. 218, decided this day. Respondent in these cases, the Chicago Board of Trade, was joined as a defendant in the proceeding brought by Rice before the Illinois Commerce Commission. As we have noted in our opinion in the companion cases, the Rice complaint charged the defendant warehousemen with maintaining excessive, unreasonable and discriminatory rates and practices, with operating inadequate and unsafe facilities and services, and with failure to comply with other requirements of Illinois law. The Board of Trade, organized under a special Act of the Illinois legislature, operates a commercial grain exchange and has adopted rules and regulations governing transactions on the exchange. The complaint of Rice charges (1) that the rules and regulations of the Board are unreasonable and unsatisfactory in that, among other things,

they favor warehousemen and sellers of grain and discriminate against grain buyers; and (2) that the Board has from time to time adopted rules and regulations, relating to the warehousing of grain in public warehouses and the custody of grain in private warehouses without securing the prior approval of the Illinois Commission. Under Illinois law, it is alleged, such rules may not become operative without approval by the Commission; and the Commission in turn has authority to adopt and promulgate rules of its own. Ill. Rev. Stat. 1945, ch. 114, § 194b.[1] Relief asked on this phase of the proceeding was a declaration that the Board's rules, which did not have the prior approval of the Commission, were void; and an order that the Board adopt and submit rules which were fair, equitable, adequate and specific.

The Board moved to dismiss the proceeding before the Commission on the ground that the Commodity Exchange Act, 49 Stat. 1491, as amended, 7 U. S. C. § 1 *et seq.,* and the regulations thereunder superseded the provisions of Illinois law which Rice sought to invoke. That motion was denied. Thereupon, these suits were instituted in the District Court to enjoin the proceedings before the Illinois Commerce Commission. The District Court dismissed the complaints. The Circuit Court of Appeals reversed. 156 F. 2d 33. The cases are here on certiorari.

The Chicago Board of Trade is "the greatest grain market in the world." *Board of Trade* v. *Olsen,* 262 U. S.

---

[1] That section provides: "No rule or regulation of any board of trade or grain exchange which relates to the warehousing of grain in any public grain warehouse, or which relates to the custody of grain in any private warehouse, or the use or negotiation of custodian's receipts for such grain, shall be or become operative until such rule or regulation is approved by the Illinois Commerce Commission, and the Illinois Commerce Commission may adopt and promulgate reasonable rules and regulations consistent with the provisions of this Act for the purpose of making this Act effective."

1, 33. Its activities have been regulated by Congress by the Future Trading Act, 42 Stat. 187, by the Grain Futures Act, 42 Stat. 998, and by the Commodity Exchange Act. See H. R. Rep. No. 421, 74th Cong., 1st Sess. The Board of Trade claims a status under the Commodity Exchange Act which, it is contended, precludes the Illinois Commission from entertaining the Rice complaint.

The Commodity Exchange Act provides comprehensive regulation of trading in futures on commodity exchanges which are designated as "contract markets" by the Secretary of Agriculture. The Secretary is authorized to designate any board of trade as a contract market on its compliance with prescribed terms and conditions. § 5. The Chicago Board of Trade has been so designated. The Act contemplates that each contract market will adopt rules governing transactions in futures contracts. Approval of a board of trade as a contract market may be made only when "the governing board thereof provides for the prevention of manipulation of prices and the cornering of any commodity by the dealers or operators upon such board." § 5 (d). The Act contains provisions which prohibit certain types of trading practices (see for example §§ 4b, 4c, 4h) and other provisions (as for example those dealing with excessive speculation, see § 4a) which limit or control buying and selling on contract markets. But we are not particularly concerned with those phases of the federal regulatory scheme. So far as the problem of supersedure is concerned, this Act is unlike the one considered in the companion cases, as we shall see. Moreover, the subject matter of the complaint filed by Rice with the Illinois Commission against the Board of Trade relates only to the warehousing of grain. On that matter the Act has only two specific provisions.

It provides in the first place that receipts issued under the United States Warehouse Act, 39 Stat. 486, as amended, 7 U. S. C. § 241 *et seq.*, shall be accepted with-

out discrimination in satisfaction of futures contracts made on or subject to the rules of the contract market, even though the warehouseman is not also licensed under state law or enjoys different privileges than those accorded by state law, provided *inter alia,* that "the warehouse in which the commodity is stored meets such reasonable requirements as may be imposed by such contract market on other warehouses as to location, accessibility, and suitability for warehousing and delivery purposes." § 5a (7). Moreover, each contract market has some control over warehouses in which or out of which any commodity is deliverable on any contract for future delivery made on or subject to the rules of the contract market. Thus the contract market must require the warehouse operators "to make such reports, keep such records, and permit such warehouse visitation" as the Secretary may prescribe. § 5a (3). All rules and regulations of a contract market, and all changes and proposed changes, must be filed with the Secretary. § 5a (1).

Enough of the Act has been summarized to show that it imposes on contract markets, under the supervision of the Secretary, (1) duties of preventing or controlling certain trading practices and of supervising transactions in futures contracts, and (2) some responsibility for standardizing deliverable warehouse receipts and assuring their integrity. The failure or refusal of a board of trade to comply with the provisions of the Act or any of the rules and regulations of the Secretary is cause for suspension or revocation of the authority of the board to act as a contract market. § 5b. And see § 6 (a). Criminal penalties are provided for certain violations of the Act, or of rules or regulations of the Secretary, by a board of trade or any of its directors, officers, agents or employees. §§ 6b, 9. The Secretary has the power to "make such investigations as he may deem necessary to ascertain the facts regarding the operations of boards of trade . . . ." § 8.

And the Secretary is given broad rule-making powers. § 8a (5).

The Secretary has promulgated numerous rules and regulations covering a variety of subjects pertaining to contract markets and their activities.[2] The following are relevant here, since they relate to the warehousing of grain: (1) a requirement that each contract market file information concerning warehouses in which or out of which commodities are deliverable in satisfaction of futures contracts made on the contract market, § 1.43; and (2) a provision that each contract market shall require operators of warehouses whose receipts are deliverable in satisfaction of futures contracts made on or subject to the rules of the contract market (a) to keep specified records, (b) to furnish information concerning stocks of commodities in warehouses, (c) to permit visitation of the premises and inspection of the books and records by duly authorized representatives of the Federal Government. § 1.44.

In pursuance of the latter regulation of the Secretary, the Board of Trade enacted the rules and regulations which Rice challenged in the proceedings before the Illinois Commission. One rule provides that deliveries shall be made by delivery of warehouse receipts issued by warehouses which have been declared "regular" by the Board. Rule 281. The Board's regulations relating to warehousing of grain set forth the procedure and standards by which warehouses may be made "regular." [3]

---

[2] The rules and regulations are to be found in 17 C. F. R., Part 1.

[3] These regulations provide, *inter alia,* that the warehouses must be "conveniently approachable by vessels of ordinary draft," have "customary shipping facilities," and charge rates not exceeding a specified maximum (Reg. 1620); must file a bond satisfactory to the Board (Reg. 1621); must have proprietors or managers in "unquestioned good financial standing and credit" (Reg. 1624); must be "connected by railroad tracks with one or more of the eastern railway lines" (Reg. 1625); and must be "provided with modern improve-

It is apparent that the federal scheme of regulation of futures trading extends to the whole futures contract— to its satisfaction, as well as to its execution. It is also apparent that the Act provides some control over (1) warehouse receipts which are acceptable in satisfaction of sales and purchases on the contract market, and (2) the qualifications of the warehouses whose receipts will be accepted for such deliveries. But there is not contained in the Commodity Exchange Act, as there is in the United States Warehouse Act, see *Rice* v. *Santa Fe Elevator Corp., supra,* a declaration by Congress that the system which it has adopted for the regulation of trading on contract markets is exclusive of state regulation. Here Congress has gone no further than to write into the Act prohibitions and controls and to give the force of law both to them and to rules and regulations of the Secretary made within the scope of his statutory authority. With exceptions which we will note, state regulations which conflict with the requirements of the Act or with the rules and regulations of the Secretary would be superseded under the familiar rule.

Congress treated the rules and regulations of the Board of Trade differently from those of the Secretary. It did not undertake to put behind them civil or criminal sanctions.[4] It merely furnished standards (or authorized the

---

ments and appliances for the convenient and expeditious receiving, handling, and shipping of grain in bulk." (Reg. 1626.)

Any "regular" warehouse may be declared "irregular" by the Board at any time for violation of the laws of Illinois or the rules and regulations of the Board (Reg. 1623), or because of any important change in the conditions of any warehouse or disregard or evasion of the requirements governing regular warehouses (Reg. 1629).

[4] We therefore have no attempt here to endow private groups with law-making functions. Cf. *Schechter Corp.* v. *United States,* 295 U. S. 495; *United States* v. *Socony-Vacuum Oil Co.,* 310 U. S. 150, 225–227; *Parker* v. *Brown,* 317 U. S. 341, 350–352.

Secretary to do so) to which the rules and regulations of the Board were to conform. And while there is provision in some instances for disapproval of the Board's rules by the Secretary of Agriculture (see § 4c), there is no provision for his approval or disapproval of the rules challenged in the Illinois proceeding. Insofar as those rules are concerned, all that the Act and the regulations of the Secretary do is to define the area in which the Board may provide standards for warehouses whose receipts are acceptable in satisfaction of futures contracts. By the terms of § 5a (7) the requirements fixed by the Board must be "reasonable" and they must relate to "location, accessibility, and suitability for warehousing and delivery purposes." If the Board transcends those bounds, it violates the Act. See § 6b. But within that area it has considerable discretion.[5]

Hence it seems to us that no action of the Illinois Commission within the zone where the Board has freedom to act would contravene the federal scheme of regulation.[6] It would be quite a different matter if the Illinois Commission adopted rules for the Board which either violated

---

[5] In the present proceeding the question of the validity of the existing rules and regulations of the Board of Trade under the Commodity Exchange Act is not in issue, and we intimate no opinion upon it.

[6] It is suggested that the regulations of the Board of Trade or those which the Illinois Commerce Commission may impose on it are automatically invalid insofar as they relate to warehouses. For in *Rice* v. *Santa Fe Elevator Corp.*, *supra*, we have held that the United States Warehouse Act excludes all state regulation, no matter how complementary, of those subjects touched by the federal regulatory scheme. But the situation here is quite different. In the first place, we are dealing with a measure of regulation over warehouse receipts not federal warehousemen; and the regulations which the Board of Trade is authorized to formulate do not carry civil or criminal sanctions. In the second place, Congress by granting the Board of Trade freedom to regulate within this narrow field has by that very act negatived any inference that the Federal Government has preempted it by requirements of its own.

the standards of the Act or collided with rules of the Secretary. But such collision is not necessary; and we cannot assume that the Illinois Commission will take any action which in any way impairs the federal regulatory scheme.

There is other intrinsic evidence that Congress did not preclude state regulation which supplements or bolsters the federal scheme. Sections 4b and 4c of the Act make unlawful a variety of fraudulent and deceptive practices on contract markets. And § 4c provides that "nothing in this section or section 4b shall be construed to impair any State law applicable to any transaction enumerated or described in such sections." These fraudulent practices, or many of them, have long been the occasion for the exercise by the States of their historic police powers. Federal regulation in those fields would therefore almost certainly conflict with state laws. Thus the provision in § 4c serves the function of preventing supersedure and preserving state control in two areas where state and federal law overlap. Where Congress used such care to preserve specific state authority, even when it duplicated federal regulation, it is a fair inference not only that supersedure was to take its natural course where rights not saved to the States were involved, *First Iowa Hydro-Electric Coop.* v. *Federal Power Commission,* 328 U. S. 152, 175, but also that non-conflicting state authority was left undisturbed. Moreover the provision in § 12 of the Act that the Secretary "may cooperate with any department or agency of the Government, any State . . . or political subdivision thereof" supports the inference that Congress did not design a regulatory system which excluded state regulation not in conflict with the federal requirements. See *Townsend* v. *Yeomans,* 301 U. S. 441, 454; *Union Brokerage Co.* v. *Jensen,* 322 U. S. 202, 209.

Respondents' claim of supersedure is, therefore, premature. Until it is known what rules the Illinois Commission will approve or adopt, it cannot be known whether

there will be any conflict with the federal law. Any claim of supersedure can be preserved in the state proceedings. And the question of supersedure can be determined in light of the impact of a specific order of the state agency on the Federal Act or the regulations of the Secretary thereunder. Only if that procedure is followed can there be preserved intact the whole state domain which in actuality functions harmoniously with the federal system. For even action which seems pregnant with possibilities of conflict may, as consummated, be wholly barren of it.

*Reversed.*