[S.F. No. 23422. Dec. 20, 1977.]

ENVIRONMENTAL DEFENSE FUND, INC., et al.,
Plaintiffs and Appellants, v.
EAST BAY MUNICIPAL UTILITY DISTRICT et al.,
Defendants and Respondents;
COUNTY OF SACRAMENTO, Intervener and Appellant.

328

330

**COUNSEL**

Thomas J. Graff, Morrison, Foerster, Holloway, Clinton & Clark, Morrison & Foerster and F. Bruce Dodge for Plaintiffs and Appellants.

John B. Heinrich, County Counsel, and L. B. Elam, Deputy County Counsel, for Intervener and Appellant.

Evelle J. Younger, Attorney General, Carl Boronkay and Robert H. O'Brien, Assistant Attorneys General, Roderick Walston, Richard C. Jacobs, Nicholas C. Yost and Jan E. Chatten, Deputy Attorneys General, Henderson, Goodwin, Marking & Rogers and Robert E. Goodwin as Amici Curiae on behalf of Plaintiffs and Appellants and Intervener and Appellant.

John B. Reilley for Defendants and Respondents.

Kronick, Moskovitz, Tiedemann & Girard, Adolph Moskovitz and Clifford W. Schulz as Amici Curiae on behalf of Defendants and Respondents.

## OPINION

CLARK, J.—Plaintiffs and intervener appeal from judgment of dismissal following the court's sustaining defendants' demurrers without leave to amend. We affirm the judgment. ·

Plaintiffs, three corporations and three individuals, are residents of an area served by defendant East Bay Municipal Utility District (EBMUD), a governmental agency. Intervener is the County of Sacramento.

### PLAINTIFFS' COMPLAINT

We first summarize the allegations of plaintiffs' complaint. Delivering water to approximately 1,100,000 persons in Alameda and Contra Costa Counties, EBMUD possesses water rights to 325 million gallons per day (mgd) from the Mokelumne River watershed, its principal source of water. The current average water consumption within EBMUD's service area is 212 mgd.

EBMUD organized and controls Special District One which operates a waste water treatment facility. This facility performs only "primary treatment" on the water, discharging the effluent into San Francisco Bay.

In the early 1960s EBMUD determined its Mokelumne River supply would be insufficient to meet the needs of its service area by the year 1985. EBMUD thereupon undertook a wide-ranging search for supplemental water supplies. In 1968, it entered an agreement with, among others, the United States Bureau of Reclamation (Bureau). By the terms of this agreement, EBMUD obligated itself to perform specified conditions if it later signed a contract with the Bureau. One condition obligated EBMUD to construct a canal, known as the Hood-Clay Connection, if the Bureau found such a canal necessary. The Hood-Clay

Connection is an integral part of the Bureau's Central Valley Project, East Side Division.

EBMUD contracted with the Bureau in December 1970, agreeing to purchase, beginning in the year the Bureau completes its Auburn-Folsom-South Project on the American River, up to 150,000 acre feet of water annually for a period of 40 years. This water is to be delivered to EBMUD from a diversion point on the Folsom-South Canal above its intersection with the proposed Hood-Clay Connection. This choice of diversion point renders the water unavailable to the lower American River.

EBMUD's actions will cause its 1985 consumers to pay a higher price for water than if EBMUD were to reclaim waste water. And EBMUD did not, in the course of its contractual negotiations, consider waste-water reclamation as a means of supplementing existing water supplies. EBMUD's agreements have contributed to the likelihood the Bureau will complete its East Side Division. And the Bureau's completion of this project will in turn diminish flows on the lower American River, injuring recreational opportunity, increasing salination, and accelerating wild river destruction. Finally, EBMUD's conduct will pollute San Francisco Bay.

On the basis of their allegations, plaintiffs assert three causes of action. As their first cause, plaintiffs claim EBMUD's decision not to develop reclamation facilities violates article X, section 2, of the California Constitution and Water Code sections 100 and 13500 et seq. Plaintiffs' second cause contends EBMUD's decision to obtain water from the American River violates the same provisions because it contributes to the likelihood the Bureau will complete the East Side Division project. The third cause asserts the combination of the two EBMUD decisions violates the constitutional and statutory provisions.

Plaintiffs seek three orders, one requiring EBMUD to use its best efforts to rescind the 1970 contract with the Bureau, the second prohibiting EBMUD from issuing bonds to finance the construction of facilities for transmitting and distributing American River water, and the third requiring EBMUD to undertake a reclamation program "as the proof will determine is required by law."

INTERVENER'S COMPLAINT

The complaint in intervention incorporates plaintiffs' allegations. We summarize its additional allegations. The "lower" American River lies within the boundaries of Sacramento County. The river has been used by the public for scenic and recreational purposes for numerous years. In 1962, the county began developing an area along the river for a regional park, having now expended over $6 million.

EBMUD might have acquired water from the federal government at a point below the confluence of the Sacramento and lower American Rivers just as economically as from the diversion point actually chosen. As recognized by decision No. 1400 of the California Water Resources Control Board, the lower diversion point would not impair the recreational use of the American River.

In addition to the relief sought in plaintiffs' complaint, the complaint in intervention prays for a declaration that EBMUD lacked legal capacity to enter the 1970 contract because the diversion point constitutes an unreasonable water use.

Plaintiffs' first amended complaint combines the allegations of their original complaint and of intervener's complaint, seeking the relief claimed in both.

The trial court sustained defendants' general demurrers on the ground the case is governed by federal—not state—law. In its extensive and well reasoned opinion, the trial court noted that EBMUD is purchasing water from a federal project authorized by Congress, that the Bureau has obtained a permit for the project from the State Water Resources Control Board (SWRCB), and that plaintiffs had not challenged the legality of the federal project. The trial court was of the opinion application of state law might render the water unsalable, interfering with the federal government's water rights and with the project itself.

While holding that federal law controls this proceeding, the trial court addressed plaintiffs' state law causes of action. The court held plaintiffs failed to assert a cause of action on the basis of article X of the California Constitution or Water Code section 100 because they were not claiming a property right in the water adverse to the rights of the defendants. The

court further ruled Water Code section 13500 et seq. do not impose a legal duty on EBMUD to reclaim waste water.

FEDERAL PREEMPTION

At the outset we must determine whether the Reclamation Act of 1902 (43 U.S.C. § 371 et seq.) precludes application of state law to a contract between a state entity and the Bureau. It is undisputed that EBMUD *in general* possesses authority to contract with the Bureau. (Pub. Util. Code, §§ 12721, 12801, 12844.)

EBMUD contends the United States Supreme Court has interpreted the act as limiting application of state law to merely defining what constitutes a compensable property interest. EBMUD asserts state law is otherwise preempted. Plaintiffs and intervener on the other hand argue that the cooperative relationship between the states and the federal government established by federal law permits the states to determine who may receive water from a federal project and under what conditions. (See generally, Sax, *Problems of Federalism in Reclamation Law* (1965) 37 Colo.L.Rev. 49.)

■ We conclude the Reclamation Act preempts state law (1) when state law conflicts with federal law, (2) when federal law vests the federal agency with final authority over the subject matter, or (3) when the application of state law would frustrate a federal objective. ■ Insofar as the complaints challenge construction of the canal and the choice of diversion point on the basis of state law, they fail to state a cause of action because they attempt to use state law to determine a matter within the authority of the federal agency. ■ Insofar as the complaints seek to compel EBMUD to reclaim water, there is no federal or state conflict, application of state law will not impinge on federal controls or interests, and state law is not preempted.

■ Under the terms of the 1970 contract, EBMUD will purchase water from the Auburn-Folsom South Unit, an integral part of the Bureau's Central Valley Project being constructed under authority of the 1902 act. (43 U.S.C. § 616aaa.) Projects constructed pursuant to the 1902 act are predicated on congressional authority under the general welfare clause of the United States Constitution. (Art. I, § 8; *Ivanhoe Irrig. Dist.* v. *McCracken* (1958) 357 U.S. 275, 294 [2 L.Ed.2d 1313, 1327, 78 S.Ct. 1174]; *U. S.* v. *Gerlach Live Stock Co.* (1950) 339 U.S. 725, 738 [94 L.Ed. 1231, 1242, 70 S.Ct. 955, 20 A.L.R.2d 633].)

The Reclamation Act of 1902 includes provisions concerning preemption. Section 8 states that the act is not to be construed as interfering with state laws relating to "control, appropriation, use or distribution of water used in irrigation . . . ." The congressional enactments specifically authorizing the Central Valley Project contain a similar provision. Section 616eee of 43 United States Code directs the Secretary of the Interior to make recommendations for the use of water in accord with state law. Additionally, the act contains a provision stating, "the policy of the Congress [is] to recognize the primary responsibilities of the States and local interests in developing water supplies for domestic, municipal, industrial, and other purposes and that the Federal Government should participate and cooperate with States and local interests in developing such water supplies in connection with the construction, maintenance, and operation of Federal navigation, flood control, irrigation, or multiple purpose projects." (43 U.S.C. § 390b.)

In *Ivanhoe Irrig. Dist.* v. *McCracken* (1958) 357 U.S. 275 [2 L.Ed.2d 1313, 78 S.Ct. 1174], the Supreme Court interpreted section 8 within the context of contracts between state agencies and the Bureau for delivery of water. The contracts contained clauses, pursuant to section 5 of the Reclamation Act (43 U.S.C. § 423e), providing that water from the federal project would not be delivered to parcels exceeding 160 acres unless the owner agreed to sell the excess land. In a proceeding to confirm the contracts, an owner of 309 acres challenged the acreage limitation on state law grounds.

This court (*Ivanhoe Irr. Dist.* v. *All Parties* (1957) 47 Cal.2d 597 [306 P.2d 824]) held that the United States, by appropriating water, did not acquire full title to the water but instead entered a trust relationship with the water users of this state, that the trust imposed the obligations of state law on the federal government, and that under section 8, state rather than federal law was determinative of water rights. (47 Cal.2d at pp. 626-629.) Accordingly, this court held the contractual provisions embodying section 5 invalid as inconsistent with Water Code section 22250.

The United States Supreme Court granted certiorari and reversed. The high court framed the issue as whether or not section 8 allowed application of state law so as to nullify the specific and mandatory congressional directives of section 5. (357 U.S. at p. 290 [2 L.Ed.2d at p. 1325].) Expressly refusing to pass generally on the coverage of section 8 in the area of federal-state relations (*id.,* at p. 292 [2 L.Ed.2d at p. 1326]),

the court ruled the specific provisions of section 5 governed the general provisions of section 8. (*Id.*, at p. 291 [2 L.Ed.2d at p. 1325]; *Nebraska* v. *Wyoming* (1945) 325 U.S. 589, 615 [89 L.Ed. 1815, 1830, 65 S.Ct. 1332].)

The Supreme Court's decision in *Ivanhoe* did not hold—as EBMUD now urges—that section 8 allowed application of state law only to define what constitutes a compensable property interest. The often cited statement, "As we read § 8, it merely requires the United States to comply with state law when, in the construction and operation of a reclamation project, it becomes necessary for it to acquire water rights or vested interests therein" (357 U.S. at p. 291 [2 L.Ed.2d at p. 1325]), must be read in context. This statement is found in a paragraph which begins by pointing out this court's construction of section 8 rendered the application of state law absolute. The statement itself is prefaced by the court's comment, "We believe [the California Supreme Court's construction of section 8] erroneous *insofar as the substantive provisions of § 5 of the 1902 Act are concerned.*"

*Ivanhoe* fails also to support plaintiffs' and intervener's claim that section 8 permits the states to determine who may receive water from a federal project and under what conditions. The Supreme Court expressly stated it was not passing generally on the coverage of section 8 (*id.* at p. 292 [2 L.Ed.2d at p. 1326]) and that it "need not determine whether a state could [by preventing state agencies from entering into contracts] frustrate the consummation of a federal project. . . . (*Id.* at p. 290 [2 L.Ed.2d at p. 1325])." *Ivanhoe* establishes that under section 8 inconsistent state law may not be applied to defeat a specific and mandatory congressional directive, expressly leaving open the broader questions argued by the parties before us.

Similarly, *City of Fresno* v. *California* (1963) 372 U.S. 627 [10 L.Ed.2d 28, 83 S.Ct. 996], fails to support the construction of section 8 urged by the parties. Like *Ivanhoe* it holds that state law may not be applied so as to defeat a specific and mandatory congressional directive. In addition, it extends the preemption doctrine by holding state laws preempted when they impair powers delegated to the administrator.

In *Fresno* the city sought a declaration it possessed prior right as well as statutory priority under state law to use water impounded by the Bureau for municipal and domestic purposes and that it was entitled to

receive project water at the same rate charged for water delivered for irrigation.

The court held section 8 could not be applied to divest the United States of its eminent domain power. (372 U.S. at p. 630 [10 L.Ed.2d at p. 30].) The court pointed out that under section 9(c) of the Reclamation Project Act of 1939 (43 U.S.C. § 485h(c)) Congress had specifically prohibited contracts to supply municipal water unless the Secretary of the Interior determined the contracts would not impair the project's irrigation purposes. (*Id.* at p. 631 [10 L.Ed.2d at p. 31].) The case holds that state law was preempted because of the eminent domain and delegated contract powers. The case is of no aid to plaintiffs and intervener.

Section 8 was not limited to merely allowing state law to define property interests as urged by EBMUD. The court's statement in *Fresno* that "the effect of § 8 *in such a case* is to leave to state law the definition of the property interests, if any, for which compensation must be made" (372 U.S. at p. 630 [10 L.Ed.2d at p. 31]; italics added) is not to the contrary. The above italicized language refers to cases involving the federal government's eminent domain power. (See *Ivanhoe Irrig. Dist.* v. *McCracken, supra,* 357 U.S. 275, 291 [2 L.Ed.2d 1313, 1325]; *U. S.* v. *Gerlach Live Stock Co., supra,* 339 U.S. 725.) The present case does not concern the federal government's eminent domain authority.

In the third United States Supreme Court case involving section 8, *Arizona* v. *California* (1963) 373 U.S. 546 [10 L.Ed.2d 542, 83 S.Ct. 1468], the court resolved a controversy among several states concerning their rights to use water from the Colorado River and its tributaries. The decision was governed by the provisions of the Boulder Canyon Project Act. (43 U.S.C. §§ 617-617t.)

*Arizona* arose against a background of aborted attempts by the several states to agree upon a division of the Colorado River watershed water through interstate compact. When the states were unable to agree, Congress responded by passing the Boulder Canyon Project Act. Section 5 of the act (43 U.S.C. § 617d) provides that the Secretary of the Interior is authorized to contract pursuant to regulations he may prescribe for the storage and delivery of water and that no person is entitled to the use of any water except by contract with the secretary. Section 8(b) of the act (43 U.S.C. § 617g(b)) states that any compact entered among the states

would be "subject to all contracts, if any, made by the Secretary under section [5]. . . ."

In *Arizona* the argument was made that the secretary was obligated to apply the prior appropriation laws of the states in distributing project water. This argument was predicated on section 18 of the Boulder Canyon Project Act (43 U.S.C. § 617g) and section 8 of the Reclamation Act of 1902. Section 18 provides that the act shall not be construed as interfering with states' rights to adopt such laws as are deemed necessary concerning the appropriation, control, and use of waters within their borders. Section 8 of the general reclamation law was made applicable through section 14 of the Boulder Canyon Project Act (43 U.S.C. § 617m) by incorporation by reference.

The Supreme Court rejected this argument. Pointing out that the provisions of sections 5 and 8(b) gave supremacy to the secretary's contracts (373 U.S. at p. 580 [10 L.Ed.2d at p. 566]), the court held the general saving language of sections 18 and 8 could not be used to nullify the contractual power expressly conferred upon the secretary by section 5. (*Id.* at pp. 587-588 [10 L.Ed.2d at pp. 570-571].) The court noted the Boulder Canyon Project Act reflected, largely through section 5, the recognition by Congress of the need for unitary management and control of the multi-state water distribution system. It also pointed out that allowing too great a scope to state law would endanger the federal objectives. "Subjecting the Secretary to the varying, possibly inconsistent, commands of the different state legislatures could frustrate efficient operation of the project and thwart full realization of the benefits Congress intended this national project to bestow." (373 U.S. at pp. 589-590 [10 L.Ed.2d at p. 572].)

Although *Arizona* differs from the instant case both because several states rather than only one were involved and because the secretary possessed broader powers than in the 1902 act, the Supreme Court's approach in interpreting section 8 and related sections is instructive. The court held that Congress preempts state laws not only when direct conflict exists but also when danger exists in that state law either interferes with the secretary's expressly delegated powers, frustrates operation of the project, or limits the benefits of the project.

Cases dealing with statutes similar to section 8 confirm that *Arizona* reflects the proper construction of the provision.

In *First Iowa Coop. v. Power Comm'n* (1945) 328 U.S. 152 [90 L.Ed. 1143, 66 S.Ct. 906], the State of Iowa sought the court's ruling that an applicant for a license from the Federal Power Commission (FPC) must, under federal law (16 U.S.C. §§ 802(b), 821), first comply with state law. Section 9(b), of the Federal Power Act (16 U.S.C. § 802(b)) requires an applicant, as a condition to obtaining a license, to submit satisfactory evidence of compliance with state law to the FPC. Section 27 (16 U.S.C. § 821), like section 8 of the Reclamation Act, provides that nothing in the act shall be interpreted so as to interfere with state laws concerning the control, appropriation, use or distribution of water.

The Supreme Court held federal law does not require compliance with state law as a condition precedent to securing a license. The court noted the state laws in question not only concerned the same matters Congress had committed to the discretion of the FPC but were also inconsistent with federal requirements. (328 U.S. at pp. 165-167 [90 L.Ed. at pp. 1150-1151].) Under these circumstances, state law was held to have been preempted. The court reasoned that the application of state law would frustrate the congressional purpose of establishing a cooperative dual system of control by vesting two agencies—one state and one federal —with final authority over the same subject matter. (*Id.,* at pp. 167-168 [90 L.Ed. at pp. 1151-1152].) The court pointed out the statutory scheme created a dual system of control allowing each agency final authority within its sphere of jurisdiction. (*Id.*) Section 27 is intended to prevent supersedure of state law within the jurisdiction reserved to the states. (*Id.* at pp. 175-176 [90 L.Ed. at pp. 1155-1156].)

Another federal statutory provision analogous to section 8 was construed in *Rice v. Chicago Board of Trade* (1946) 331 U.S. 247 [91 L.Ed. 1468, 67 S.Ct. 1160]. In *Rice* the petitioner sought a declaration the Board of Trade's rules relating to warehousing grain were invalid, not having been first submitted to the Illinois Commerce Commission for approval. The board—itself a state agency—argued the authority of the commission had been superseded by the Commodity Exchange Act. (7 U.S.C. § 1 et seq.) Section 4(c), of the federal act provided, "nothing in this section . . . shall be construed to impair any state law applicable to any transaction enumerated or described in such sections."

The court held the regulations of the Illinois Commerce Commission were superseded to the extent they were inconsistent with federal law.

(331 U.S. at pp. 255-256 [91 L.Ed. at p. 1474].) This result was found required by section 4(c). The court reasoned that while section 4(c) left undisturbed nonconflicting state authority "supersedure was to take its natural course where rights not saved to the States were involved." (*Id.* at p. 255 [91 L.Ed. at p. 1474].)

Insofar as both complaints attempt to invalidate the contract on the basis of its terms and conditions, the above principles require our finding preemption. As noted, they challenge both construction of Hood-Clay Connection and choice of diversion point. Plaintiff's complaint seeks rescission partially on the ground the EBMUD-Bureau contract will contribute to the likelihood the Bureau will complete development of the East Side Division, an integral part of the Central Valley Project specifically authorized by Congress. (43 U.S.C. § 616aaa et seq.)

The federal reclamation laws clearly establish that construction and maintenance of water facilities are vested in the Bureau. (E.g., 43 U.S.C. § 390b(b) [projects constructed by Bureau or Corps of Engineers]; *id.* § 616aaa [Secretary of Interior to construct, operate, and maintain Central Valley Project, American River Division].) The determination of diversion point obviously concerns construction of the federal project. The location of the diversion point in fact comprises a substantial part of the federal project. Similarly, construction and location of the Hood-Clay Connection are clearly within the authority invested in the Secretary of the Interior and the Bureau. The allegation the EBMUD-Bureau contract will facilitate the Bureau's completion of the Central Valley Project on its face represents attempted interference with the Bureau's completion of a project Congress has directed it to undertake. Accordingly, we conclude that the complaint fails to state a cause of action insofar as it seeks invalidation of the contract on grounds that under state law construction of the canal or placement of the diversion point assertedly involve an unreasonable water use.

■ On the other hand, the cause of action seeking to compel EBMUD to reclaim waste water is not preempted by federal law. Nothing exists in the federal reclamation laws precluding parties contracting with the federal government from securing additional water from other sources.

WASTE WATER

■ In support of their causes of action to compel EBMUD to reclaim waste water, plaintiffs and intervener contend EBMUD's failure to reclaim contravenes the Water Reclamation Law (Wat. Code, § 13500 et seq.), and violates article X, section 2, of the California Constitution and Water Code section 100. However, we conclude the contention is not properly before us in this proceeding. Parties seeking to compel a user to reclaim waste water must, in the first instance, seek relief from the State Water Resources Control Board (SWRCB), and having failed to do so are precluded from maintaining such cause of action against EBMUD.

Article X, section 2, provides in full: "It is hereby declared that because of the conditions prevailing in this State the general welfare requires that the water resources of the State be put to beneficial use to the fullest extent of which they are capable, and that the waste or unreasonable use or unreasonable method of use of water be prevented, and that the conservation of such waters is to be exercised with a view to the reasonable and beneficial use thereof in the interest of the people and for the public welfare. The right to water or to the use or flow of water in or from any natural stream or water course in this State is and shall be limited to such water as shall be reasonably required for the beneficial use to be served, and such right does not and shall not extend to the waste or unreasonable use or unreasonable method of use or unreasonable method of diversion of water. Riparian rights in a stream or water course attach to, but to no more than so much of the flow thereof as may be required or used consistently with this section, for the purposes for which such lands are, or may be made adaptable, in view of such reasonable and beneficial uses; provided, however, that nothing herein contained shall be construed as depriving any riparian owner of the reasonable use of water of the stream to which the owner's land is riparian under reasonable methods of diversion and use, or as depriving any appropriator of water to which the appropriator is lawfully entitled. *This section shall be self-executing, and the Legislature may also enact laws in furtherance of the policy in this section contained.*" (Italics added.) Water Code sections 100 and 101 are substantially the same as the constitutional provision.

The Legislature, consistent with its authority under article XIV, section 3, has established a thorough statutory system insuring reasonable water allocation and safeguarding water purity, commensurate in

scope with the constitutional provision. (*Modesto Properties Co.* v. *State Water Rights Board* (1960) 179 Cal.App.2d 856, 860 [4 Cal.Rptr. 226].) The statutes vest the SWRCB with full authority to "exercise the adjudicatory and regulatory functions of the state in the field of water resources." (Wat. Code, § 174; *Johnson Rancho County Water Dist.* v. *State Water Rights Board* (1965) 235 Cal.App.2d 863, 867 [45 Cal.Rptr. 589].) It has been granted broad authority to control and condition water use, insuring utilization consistent with public interest. (Wat.Code, § 1257.) This authority includes protection of the environment. (*Id.*) The SWRCB's powers extend to regulation of water quality and prevention of waste. (E.g., Wat. Code, §§ 100, 275.) It has adopted administrative regulations to prevent waste and unreasonable use. (Cal.Admin.Code, tit. 23, §§ 764.10-764.13.)

The Legislature enacted the Water Reclamation Law to encourage waste water reclamation as a means of supplementing existing water supplies. (Wat. Code, §§ 13510-13512.) The Department of Health, the Regional Water Quality Control Boards, and the SWRCB regulate reclamation and use of waste water. (Wat. Code, §§ 13320, 13510-13512.)

The Department of Health is charged with responsibility for establishing statewide reclamation criteria as the basic governing standard to insure public health and safety in view of the hazards attendant in waste water reclamation. (Wat. Code, §§ 13520-13521.) In addition to statewide criteria, the regional boards, in consultation with the Department of Health, are directed to promulgate water reclamation requirements. Water reclamation requirements must include or be consistent with the statewide reclamation criteria and may be imposed on the reclaimer, user, or both. (Wat. Code, § 13523.)

Following establishment of criteria, reclamation or use of waste water is prohibited until the regional boards promulgate reclamation requirements or determine no requirement is necessary. (Wat. Code, § 13524.) Any person reclaiming or proposing to reclaim, or using or proposing to use reclaimed waste water in any region governed by reclamation criteria is required to file a verified report with the regional board. This report must contain information required by the regional boards. (Wat. Code, § 13522.5.) The regional boards may also require submission of preconstruction reports. (Wat. Code, § 13523.)

The law provides both criminal and injunctive sanctions to insure enforcement. Any person using reclaimed waste water after establishment of criteria, but prior to promulgation of reclamation requirements, is guilty of a crime. (Wat. Code, § 13526.) Similarly, violation of reclamation requirements subjects the violator to criminal penalties. (Wat. Code, § 13525.5.) Failure of a party to file a report containing the information deemed necessary by the regional board constitutes a crime. (Wat. Code, § 13522.6.) The Attorney General must, upon request by the regional board, seek injunction or other relief to compel any person to promptly file a report (Wat. Code, § 13522.7), or to prohibit any person from violating the law's provisions. (Wat. Code, § 13525.) Finally, the Department of Health or any local health officer is required to abate reclaimed waste water use causing contamination. (Wat. Code, § 13522.)

 The statutory pattern clearly reflects the Legislature's intent to vest regulation of waste water reclamation in the administrative agencies.

Due to the danger to public health and to the problems of feasibility connected with waste water reclamation, the statutory provisions prohibit use of reclaimed waste water until the Department of Health establishes statewide criteria and the regional boards establish reclamation requirements. The careful consideration demanded by the Legislature prior to permitting reclamation of waste water is evidenced by its decision to make violations of its statutes criminal. The broad powers given to boards toward obtaining injunctions and enforcing compliance with adopted criteria and requirements also reflect legislative intent to vest regulation of waste water reclamation in the boards.

The SWRCB is exercising those powers. It has recently required a public utility to demonstrate the utility's study and conclusions concerning waste water reclamation. (Order 76-12.) SWRCB is now developing policies and plans for waste water reclamation throughout the state. (Cal. State Water Resources Control Board, Policy and Action Plan for Water Reclamation in Cal. (Draft, Dec. 1976).)

 Permitting our superior court's concurrent jurisdiction in this difficult area would impair the comprehensive administrative system

established by the Legislature to guarantee reasonable water use and purity. The scope and technical complexity of issues concerning water resource management are unequalled by virtually any other type of activity presented to the courts. ■ What constitutes reasonable water use is dependent upon not only the entire circumstances presented but varies as the current situation changes. As this court noted in *Joslin* v. *Marin Mun. Water Dist.* (1967) 67 Cal.2d 132, 140 [60 Cal.Rptr. 377, 429 P.2d 889], "what is a reasonable use of water depends on the circumstances of each case, such an inquiry cannot be resolved *in vacuo* from statewide considerations of transcendent importance."

■ The question whether available economic resources should be devoted to waste water reclamation or development of other water supplies is basically a legislative one. The necessity of considering the entire circumstances is obviously increased when, as here, a court is called upon to adjudicate the reasonableness of a decision not to reclaim waste water in the context of a long term procurement of water supplies for over a million people. The issues are far more complex and different both in kind and degree from those presented when a court adjudicates only between two competing users. (E.g., *Joslin* v. *Marin Mun. Water Dist., supra,* 67 Cal.2d 132 [reasonableness of municipal water supply as opposed to availability of sand, gravel, and rock]; *Peabody* v. *City of Vallejo* (1935) 2 Cal.2d 351 [40 P.2d 486] [reasonableness of municipal use versus water flow over land to deposit silt and wash out salt deposits].) The matter is still further complicated when, as here, transcendent interests of public health and safety beyond normal water use are involved.

When as in the instant case the statutory pattern regulating a subject matter integrates the administrative agency into the regulatory scheme and the subject of the litigation demands a high level of expertise within the agency's special competence, we are satisfied that the litigation in the first instance must be addressed to the agency. (See Jaffe, Judicial Control of Administrative Action (1965) p. 121 et seq.) Plaintiffs and intervener's contentions concerning waste water reclamation must be addressed in the first instance to the SWRCB.

The judgment is affirmed.

Tobriner, Acting C. J., and Kaus, J.,* concurred.

*Assigned by the Chairperson of the Judicial Council.

**RICHARDSON, J.**—I concur in the judgment, with some misgivings.

First, I fully agree with the majority's disposition of plaintiffs' cause of action to compel EBMUD to reclaim waste water to supplement existing supplies. As the majority holds, although that cause is not preempted by federal law, it is appropriate to require plaintiffs to seek relief from the State Water Resources Control Board before pursuing their judicial remedies.

I have considerably less confidence, however, in the majority's holding that plaintiffs' cause of action to invalidate EBMUD's contract with the Bureau of Reclamation is preempted by the federal Reclamation Act. Were we considering this case afresh, without the benefit of the various preemption decisions of the United States Supreme Court discussed and relied on by the majority, we might well reach a different conclusion. Plaintiffs have alleged that the construction of the Hood-Clay Connection, and the placement of the diversion point on the Folsom-South Canal above its intersection with the Hood-Clay Connection, will result in an unreasonable use or diversion of water from the lower American River, in violation of express constitutional and statutory provisions (Cal. Const., art. X, § 2; Wat. Code, § 100) and with very serious environmental consequences. Nothing in the federal act expressly calls for a preemption of such fundamental provisions of state law; indeed, as the majority acknowledges, the language of the act arguably would support a contrary holding.

Thus, were we writing upon a clean slate, we might reasonably determine that state laws regarding water use and diversion must control despite the fact that a federal project is involved. After all, the project at issue was intended to afford improved water distribution facilities for *California* users, and it seems somewhat anomalous to hold that such a local project is exempt from state laws aimed at promoting reasonable water use for California citizens.

Nevertheless, the majority's analysis of the applicable decisions by the United States Supreme Court indicates that preemption will occur whenever application of state law could frustrate the operation of a federal project, or circumscribe the authority of federal officers responsible for administering the project. As the majority explains, plaintiffs' suit herein seeks to rescind the federal contract and enjoin construction of the proposed facilities, thereby, arguably, frustrating or defeating a federal

purpose. Under such an analysis of the preemption decisions plaintiffs' action must be dismissed.

I note, however, that although the preemption decisions may be instructive, they are not directly on point—no decision of the United States Supreme Court has as yet adopted any ironclad, unequivocal rule which would invoke the preemption doctrine whenever operation of a federal project may be threatened by application of state law. Consequently, although I concur in the judgment herein, given the present uncertainties in the applicable decisions, I fully acknowledge that a definitive opinion on this difficult subject must come from the high court.

**MOSK, J.**—I dissent.

This case comes to us at the pleading stage, a general demurrer having been sustained without leave to amend. Our task is to ascertain whether any cause of action in the complaint, liberally construed, states facts indicating plaintiffs are entitled to some relief. (*Selby Realty Co.* v. *City of San Buenaventura* (1973) 10 Cal.3d 110, 123 [109 Cal.Rptr. 799, 514 P.2d 111].) The majority decide this case by declaring, as a matter of law, that defendants have valid defenses. I would hold that the pleadings justify giving plaintiffs and the County of Sacramento their day in court.

I

It is incongruous for EBMUD, a creation of the state, to insist upon a right to violate state water law simply because of a contrived conflict with the source from which it chooses to purchase water. I submit that an agency dependent upon the State of California for its existence cannot voluntarily undertake to buy water from a federal bureau and then set up as a defense to the alleged impropriety of its actions a claim that state law is not applicable to its decision to enter into the transaction.

The problem of preemption is not unduly complicated. If any agency were to attempt to place in issue, or to dictate to a federal bureau, the terms which the latter may impose as to the quantity, price, site or other conditions for the sale of water from a federal project, undeniably there would be preemption and federal law would prevail. (*Ivanhoe Irrig. Dist.* v. *McCracken* (1958) 357 U.S. 275 [2 L.Ed.2d 1313, 78 S.Ct. 1174].) But that is not involved here. The plaintiffs, and the County of Sacramento as intervener, do not seek to impose their will on or to challenge the

federal government, but merely to hold a state-created agency accountable under state law for whether and to what extent it may initiate a contract to purchase water. Under these circumstances there is no federal-state controversy which invokes the doctrine of preemption. The only conflict here is between the plaintiffs and the County of Sacramento on the one hand and a state-created agency on the other as to the propriety of action taken by the latter.

Defendants rely upon a series of Supreme Court decisions (*City of Fresno* v. *California* (1963) 372 U.S. 627 [10 L.Ed.2d 28, 83 S.Ct. 996], *Dugan* v. *Rank* (1963) 372 U.S. 609 [10 L.Ed.2d 15, 83 S.Ct. 999], and *Ivanhoe Irrig. Dist.* v. *McCracken, supra,* 357 U.S. 275, to support the proposition that since EBMUD will be buying federal water, federal and not state law applies to the transaction of purchase. That broad principle is correct, but in this context it is a non sequitur.

The plaintiffs do not challenge the validity or terms of the executed contract with the federal bureau. They complain that EBMUD improperly initiated the contract in the first instance because it does not need American River water, and that even if there is a need it should seek a point of diversion closer to home in order to afford multiple use—recreational, fishing, wildlife, as well as municipal and industrial—of American River water.

The assault is not upon the federal contract per se but upon the decision of EBMUD to obtain a supplemental supply of water and to seek it by the means proposed. Thus for plaintiffs to prevail they must show only that EBMUD's original decision to proceed, under the facts alleged and to be proved, violates state law. Validity of the terms and conditions of the ultimate federal contract, which undeniably is controlled by federal law, is irrelevant to the issues framed by the complaint.

II

Even if, arguendo, we accept the faulty premise of the majority that federal law should apply to the problem before us, the applicable federal provisions refer directly back to state law, somewhat in the nature of a renvoi. The Auburn-Folsom South Unit of the Central Valley Project was authorized by an act of Congress enacted in 1965 (43 U.S.C. § 616aaa et seq.). While construction was to be undertaken pursuant to federal reclamation laws, the Secretary of the Interior was directed to

allocate water "in accord with state water laws" (Auburn-Folsom South Act, § 5, 43 U.S.C. § 616eee).

Legislative history confirms this intent of Congress. In relevant part the Committee on Interior and Insular Affairs issued a report on the project which declared: "The committee's decision [to include the section] was based on the fact that the Auburn-Folsom South project is a wholly intrastate project, with the waters of the American River arising wholly in the State of California and their use and disposition being wholly in the State of California. Therefore, the committee was of the opinion that the laws of the State of California with respect to allocation of water should be followed by the Secretary of the Interior, including the provisions assuring protection to counties and areas of origin. Furthermore, the committee's action simply retains the effect of basic Central Valley project legislation and is consistent with past practices." (Sen. Rep. No. 1289, 88th Cong., 2d Sess., (1964) pp. 3-4.)

While the act was not passed until the following year, at which time the Secretary of the Interior attempted unsuccessfully to persuade Congress to delete section 5 and its reliance upon state law, the measure was enacted in the originally recommended form.

Subsequent congressional acts give strong indication of the continuing intent to preserve the environment and in the quest to do so to yield to the states. Thus the National Environmental Policy Act of 1969 (NEPA) (42 U.S.C. § 4331) refers to the "policy of the Federal Government, in cooperation with state and local governments, . . . to use all practicable means and measures, . . . to create and maintain conditions under which man and nature can exist in productive harmony."

The Federal Water Pollution Control Act Amendments of 1972 (33 U.S.C. § 1251(b)) are even more precise: "It is the policy of the Congress to recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution, to plan the development and use (including restoration, preservation, and enhancement) of land and water resources, and to consult with the Administrator in the exercise of his authority under this Act." The amendments also give the highest order of priority to "the reclamation of wastewater" (33 U.S.C. § 1281(d)(3)).

Thus it seems abundantly clear that in this sensitive field of environmental protection, not only does no conflict emerge between federal and state policy, but the federal government has indicated a decided preference to defer to "the primary responsibilities and rights of States."

It should be apparent that the primary responsibilities and rights of California apply particularly to the American River, which is an entirely intrastate stream rising from its source in the Sierra Nevada Mountains and flowing southwestward to the City of Sacramento where it joins the Sacramento River. The American River has traditionally been utilized by the public as a scenic, sporting and recreational resource. Within recent years the County of Sacramento has acquired 2,000 acres of land along both banks of the river as an open-space green belt for recreational and scenic purposes.

Consistent with state preeminence over this intrastate stream, in 1970 when the State Water Resources Control Board issued appropriation permits to the federal Bureau of Reclamation for the Auburn-Folsom South Unit, it reserved jurisdiction to determine and prescribe minimum flows to be maintained in the American River for fish, wildlife and recreational purposes. Again in 1972, the State Water Resources Control Board ordered a minimum flow of 800 to 1,250 cubic feet of water per second for protection of fish and wildlife. That the state was prescribing the flow of water from a federally constructed project did not appear to raise any spectre of federal preemption. The EBMUD contract involved here will directly affect that same flow of water.

EBMUD will take delivery of the new supply from the Folsom South Canal. Since the water will be diverted from the canal, it will not be available to flow down the Lower American River, that section directly upstream of its joinder with the Sacramento River. It is plaintiffs' contention that if the supply were to be diverted from the Sacramento River below the confluence of the American River, the water could be released from Folsom and Nimbus Dams, flow down the American River where it could be used for fish, wildlife and recreational purposes, and then be diverted by EBMUD, if indeed EBMUD needs additional water.

Plaintiffs' contentions find support in an official decision of the State Water Resources Control Board which criticized the choice by EBMUD of the Folsom South Canal as the point of diversion. It emphasized that

the upstream rather than downstream delivery will constitute a deprivation of the possibility for multiple beneficial use of the water which EBMUD will purchase, and in effect deprive the American River of the equivalent of 210 cubic feet per second of flow.

## III

If we apply state law originally, or as in a renvoi the federal law which refers back to state law, we must consider relevant provisions of California law.

As indicated above, EBMUD is a local public agency of the State of California, organized under the Municipal Utility District Act. (Pub. Util. Code, § 11501 et seq.) A local agency may exercise only such powers as have been authorized by the laws of the state. (*Irwin v. City of Manhattan Beach* (1966) 65 Cal.2d 13, 20 [51 Cal.Rptr. 881, 415 P.2d 769].) Its very being and the extent of its authority is dependent upon the Legislature and limited by the provisions of the California Constitution. (*State of California v. Marin Mun. W. Dist.* (1941) 17 Cal.2d 699 [111 P.2d 651].) Thus the contractual powers of EBMUD must be determined exclusively by reference to the legislation under which it exists and to relevant constitutional provisions. (*Stimson v. Allessandro Irr. Dist.* (1902) 135 Cal. 389, 392 [67 P. 496, 1034].) If a contract entered into by EBMUD violates a California constitutional principle, the contract exceeds the agency's powers and is void. (*Allen v. Hussey* (1950) 101 Cal.App.2d 457, 472 [225 P.2d 674]; *County of Alameda v. Ross* (1939) 32 Cal.App.2d 135, 146 [89 P.2d 460].)

Article X, section 2, of the California Constitution is the dispositive provision of our law. In a self-executing section, the Constitution requires "that the water resources of the State be put to beneficial use to the fullest extent of which they are capable, and that the waste or unreasonable use or unreasonable method of use of water be prevented, and that the conservation of such waters is to be exercised with a view to the reasonable and beneficial use thereof in the interest of the people and for the public welfare. The right to water or to the use or flow of water in or from any natural stream or water course in this State is and shall be limited to such water as shall be reasonably required for the beneficial use to be served, and such right does not and shall not extend to the waste or unreasonable method of use or unreasonable method of diversion of water. . . ."

For added emphasis the Legislature has enacted similar provisions in Water Code section 100. This section, together with the explicit constitutional restriction, comprise the basic tenets governing water distribution in California, a subject that has given rise to scores of controversies since Gold Rush days.

The fundamental water law of California was succinctly outlined by this court in *Peabody* v. *City of Vallejo* (1935) 2 Cal.2d 351, 367 [40 P.2d 486]:

"1. The right to the use of water is limited to such water as shall be reasonably required for the beneficial use to be served.

"2. Such right does not extend to the waste of water.

"3. Such right does not extend to unreasonable use or unreasonable method of use or unreasonable method of diversion of water.

"4. Riparian rights attach to, but to no more than so much of the flow as may be required or used consistently with this section of the Constitution.

"The foregoing mandates are plain, they are positive, and admit of no exception. They apply to the use of all water, under whatever right the use may be enjoyed."

Application of the *Peabody* inhibitions in particular factual contexts is inevitably subject to fluctuating determinations. Certainly it does not lend itself to straitjacket dispositions as a matter of law.

As stated in *People* ex rel. *State Water Resources Control Bd.* v. *Forni* (1976) 54 Cal.App.3d 743, 750 [126 Cal.Rptr. 851]: "it seems evident that the overriding principle governing the use of water in California is that such use be reasonable. However, as repeated on innumerable occasions, what is reasonable use or reasonable method of use of water is a question of fact to be determined according to the circumstances in each particular case. [Citations.]" And, as observed in *Tulare Dist.* v. *Lindsay-Strathmore Dist.* (1935) 3 Cal.2d 489, 567 [45 P.2d 972]: "What may be a reasonable beneficial use, where water is present in excess of all needs, would not be a reasonable beneficial use in an area of great scarcity and great need. What is a beneficial use at one time may,

because of changed conditions, become a waste of water at a later time."· To the same effect are opinions of this court in *Joslin* v. *Marin Mun. Water Dist.* (1967) 67 Cal.2d 132, 139 [60 Cal.Rptr. 377, 429 P.2d 889]; and *Gin S. Chow* v. *City of Santa Barbara* (1933) 217 Cal. 673, 706 [22 P.2d 5].

Since the law of California is so crystal clear that reasonableness of use, reasonableness of methods of diversion and prevention of waste are questions of fact under the circumstances of each case, the majority fall into grievous error in deciding the issues herein as a matter of law. I would give these plaintiffs an opportunity to prove their allegations before a trier of fact.

### IV

Finally, with regard to the cause of action relating to failure of EBMUD to recycle wastewater, it is remarkable that the majority lean on a theory that relief must be sought from State Water Resources Control Board. For more than a century it has been deemed elementary that this court will refuse to consider issues not raised by the parties below. (*Parkside Realty Co.* v. *MacDonald* (1913) 166 Cal. 426, 432 [137 P. 21]; *Duff* v. *Fisher* (1860) 15 Cal. 375, 381; *Lotts* v. *Board of Park Commrs.* (1936) 13 Cal.App.2d 625, 636 [57 P.2d 215].) None of defendants' demurrers in this action invoked a jurisdictional contention, or a claim that administrative remedies had not been exhausted. The trial court's memorandum opinion made no reference to that doctrine as a basis for its judgment. None of the defendants raised the point in the Court of Appeal, and even here their contention was merely that this complex water problem is more legislative than judicial in substance. The administrative remedy issue should not have been considered by this court, and certainly not employed as the foundation for an opinion.

I would reverse the judgment and send the matter back to the trial court for a full hearing on the merits.

The petition of the plaintiffs and appellants for a rehearing was denied February 23, 1978, and the opinions were modified to read as printed above. Bird, C. J., and Mosk, J., were of the opinion that the petition should be granted.