**KHALID BIN TALAL BIN ABDUL AZAIZ AL SEOUD, Plaintiff,**

v.

**E.F. HUTTON & COMPANY, INC., E.F. Hutton & Company (Securities) Limited, Sharif Serageldin, and Sami Beydoun, Defendants.**

No. 88 C 5888.

United States District Court, N.D. Illinois, E.D.

Aug. 24, 1989.

David S. Maun, Robert W. Queeny, Steven B. Varick, McBride, Baker & Coles, Chicago, Ill., for plaintiff.

David L. Carden, Lee Ann Russo, Michael J. Philippi, Coffield, Ungaretti, Harris & Slavin, Chicago, Ill., for defendants.

## MEMORANDUM AND ORDER

MORAN, District Judge.

Plaintiff His Royal Highness Prince Khalid Bin Talal Bin Abdul Azaiz Al Seoud ("Prince Khalid") brings this action against defendants E.F. Hutton & Company ("Hutton–New York"), E.F. Hutton & Company (Securities) Limited ("Hutton–London") (collectively "Hutton" defendants), Sharif Serageldin ("Serageldin"), and Sami Beydoun ("Beydoun"), alleging illegal handling of his commodities account. We have before us defendants'[1] motions to dismiss, strike and for a more definite statement. Dismissal is urged pursuant to Rules 9(b) ("circumstances constituting fraud or mistake shall be stated with particularity") and 12(b)(6) ("failure to state a claim upon which relief can be granted"); the motion to strike certain paragraphs of the complaint pursuant to Rule 12(f) ("redundant, immaterial, impertinent, or scandalous matter"); and the motion for a more definite statement of the contract claim pursuant to Rule 12(e) ("party cannot reasonably be required to frame a responsive pleading") of the Federal Rules of Civil Procedure.

In such circumstances, any inference drawn must be favorable to the plaintiff, *United Milk Products Co. v. Michigan Avenue National Bank of Chicago*, 401 F.2d 14, 17 (7th Cir.1968), and the allegations contained in the complaint are to be accepted as true, *National Van Lines, Inc. v. United States*, 326 F.2d 362, 372 (7th Cir. 1964). For the following reasons, the motion to dismiss, strike and for a more definite statement is granted in part and denied in part.

## FACTS

Viewing the complaint in the light most favorable to plaintiff, the facts underlying this dispute appear as follows:

Prince Khalid is a member of the Royal House of Saudi Arabia and the brother of Prince Alwaleed Abdul Aziz Al Seoud ("Prince Alwaleed"). The latter, Prince Alwaleed, established a foundation, of which he is trustee, whose financial dealings are the subject of parallel litigation before Judge Leinenweber, *Khalid Bin Alwaleed Foundation v. E.F. Hutton & Company, Ltd., et al.*, 709 F.Supp. 815 (N.D.Ill.1989) ("Foundation" litigation).[2]

Defendants Serageldin (senior portfolio manager at Hutton–London) and Beydoun (first vice-president and manager of Hutton–London) presented a proposal to Prince Alwaleed and his financial advisor, Dr. Zia M. Hafez ("Dr. Hafez"), to invest Foundation funds through Hutton–London. The offer was first made in late 1984 and was presented in its final form in April 1985. In early May 1985, Serageldin reviewed the proposal with Prince Alwaleed and Dr. Hafez, and represented that he and Hutton were experienced in managing discretionary commodity interest trading accounts, possessed the requisite knowledge, skill and judgment to engage successfully in futures trading, and would "conservatively" exercise their discretion.

As a result of Serageldin's representations, on or about May 6, 1985, the Founda-

---

**1.** The Hutton defendants and Beydoun have submitted the motion at issue. At the time of their filing, Serageldin had not as yet been served with process. Counsel for the Hutton defendants represents that they will likely represent Serageldin and we therefore treat the motion as having been submitted on behalf of him as well. The Hutton defendants are instructed to inform the court of any developments which render that consideration inappropriate.

**2.** Additional discussion of that litigation follows *infra* at 675–76.

tion invested $5 million with Hutton; $4.4 million of that sum was invested in a discretionary managed futures account—the Foundation having authorized Hutton to engage in discretionary trading of commodity interests—and the remainder, approximately $.6 million, was traded by Beydoun.

On March 11, 1986, Serageldin reported in writing to Prince Alwaleed that the Foundation's $5 million investment had grown to $6.94 million as of February 28, 1986. In early April 1986, Serageldin used these successes to acquire the additional business of plaintiff Prince Khalid. He traveled to Saudi Arabia, met with Prince Khalid and Dr. Hafez (the latter also advised the former), and represented that trading on Prince Khalid's personal account would proceed in the same conservative manner as the Foundation's account: investing only 10 to 30 per cent of the funds in commodities, namely T–bonds, stock indexes such as the S & P 500, currencies such as the *Deutsch Mark* and Pound Sterling, and precious metals, principally gold and silver. Serageldin highlighted his ability to read "cycles" in the market and emphasized his intention to position the account to take full advantage of them. He also represented how he could minimize losses, citing his having turned the Foundation's losses in December 1985 into profits. Based on his past record, Serageldin stated he expected to achieve a 20 to 30 per cent return per year on the investment. These representations led Prince Khalid to open an account for $1.5 million which Serageldin agreed to trade in tandem with the Foundation's accounts and in a like manner. Serageldin subsequently directed all trades in Prince Khalid's account between May and October 1986.

As of May 31, 1986, the account of Prince Khalid was worth $2,431,371. Soon thereafter, and without prior disclosure to or authorization from Prince Khalid or Dr. Hafez, Serageldin changed the manner in which he handled the account: he did not trade in diverse commodity interests, held a substantial number of losing open positions for long periods of time and committed more than 30 per cent of the account's funds. For example, Serageldin traded only in T–bonds and S & P 500 index, except for an isolated silver trade in May 1986, and two others in June 1986. That exposed the account to huge losses from even small movements of those markets. He avoided diversifying the account's portfolio by failing to purchase commodity interests which moved differently than the then existing holdings. As the market moved adversely to the commodity interests then held, Serageldin increased the number of those interests, attempting to "average" the costs of positions. This technique represented a desperate effort to recover the existing significant losses to save the defendants' reputations.

Neither Serageldin, nor anyone else at Hutton, advised Dr. Hafez or Prince Khalid that the strategy for trading in the commodity account had changed or that losses of $611,115.60 in June 1986 and $428,680.25 in July 1986 were sustained. In fact, Dr. Hafez and Prince Khalid did not learn of the June and July losses until September 1986. Even as Beydoun internally questioned Serageldin's strategy, he failed to disclose those reservations to either Dr. Hafez or Prince Khalid because of his desire to generate commissions.

On September 24, 1986, Beydoun contacted Dr. Hafez and advised him that the Foundation's account had sustained unrealized losses of approximately $7 million. Serageldin assured Dr. Hafez that he was confident of his strategy in a conference call on the same date. Again Serageldin failed to inform Dr. Hafez of (1) his having changed the trading strategies respecting Prince Khalid's and the Foundation's accounts; (2) Beydoun's disagreement with and disapproval of the manner in which Serageldin traded; and (3) his intention to open new positions incurring even greater risk and generating additional commissions. The personal account of Prince Khalid was never discussed during the entire conversation.

On October 1, 1986, Beydoun finally advised Dr. Hafez of the open positions and losses in the Foundation account but failed to describe the comparable position of Prince Khalid's personal account. The lat-

ter's value had decreased from $949,267.50 (as of May 31) to $514,187.50 and was still vulnerable to even small movements in the market.

Hutton instructed Serageldin on October 2, 1968, to liquidate the remaining open positions in the Foundation account. He initially resisted that instruction but later began liquidation, targeting reduction of the account by 50 per cent. Without prior notification to Prince Khalid, liquidation of his personal account began on October 3, 1986. Dr. Hafez learned of these efforts only after the fact—during a telephone conversation with Serageldin the evening of that day. Dr. Hafez asked for an explanation and Serageldin stated he had been instructed to liquidate the personal account along with the Foundation's accounts.

Beydoun wrote Dr. Hafez on October 9, 1986, to propose several alternatives allegedly designed to recover the losses incurred by the Foundation in the accounts traded by Serageldin. Upon receipt of that letter Prince Alwaleed and Dr. Hafez met with Beydoun, Serageldin and other representatives of Hutton–London. At that meeting Dr. Hafez first learned of Beydoun's disagreement with and disapproval of Serageldin's handling of both Prince Khalid's and the Foundation's accounts. Serageldin contended that the large losses sustained by Prince Khalid were the fault of Hutton management, who had required liquidation of the account's various positions at what Serageldin considered an inopportune time. Beydoun instead claimed that Serageldin's overly aggressive trading strategy—about which Beydoun himself had warned on several occasions—caused the losses.

Between May and October 1986, Serageldin executed about 63 trades for Prince Khalid's account, 18 of which were "day trades" (positions established and liquidated the same day) and 27 of which were held only overnight (positions established on one day and liquidated the next). The commission varied on how long the account held a particular position; the overnight trades, therefore, afforded defendants a higher commission than day trades. In total, defendants received about $189,000 in commissions for trades during the period July through October 1986, and a total of $603,900 for the total time the account was open.

During the period Serageldin traded Prince Khalid's account, Serageldin would occasionally contact Dr. Hafez and discuss the purported trading strategy for the Foundation accounts. Defendants knew that Dr. Hafez devoted no time to studying the futures markets and only concerned himself with the trading of Prince Khalid's accounts during the conversations with Serageldin. Defendants also knew that Dr. Hafez understood that Prince Khalid's account was supposed to be traded in the same manner as the Foundation account. Plaintiff contends that explains why Dr. Hafez did not inquire into the trading strategy on behalf of his account. Serageldin allegedly lulled Prince Khalid into a false sense of security by continuously reassuring Dr. Hafez that the accounts Serageldin traded were making money.

The total amount of losses realized between July 8 and October 24, 1986—when trading in Prince Khalid's account ceased—was about $1,437,012. Losses from May 31, 1986—when the account's value reached its peak—were $2,027,527. Out-of-pocket losses for the time the account remained open were $1,096,155.80.

## PARALLEL LITIGATION

As previously mentioned, the Foundation's losses are the subject of litigation before Judge Leinenweber, *Khalid Bin Alwaleed Foundation v. E.F. Hutton & Company, Ltd., et al.*, 709 F.Supp. 815 (N.D.Ill.1989). That complaint was filed June 10, 1988 (approximately one month earlier than the complaint at bar), and one significant opinion has been issued therein which warrants invocation. On March 13, 1989, Judge Leinenweber granted defendants' motion to dismiss for reasons nearly identical to those at issue here. *Khalid Bin Alwaleed Foundation v. E.F. Hutton & Company, Ltd., et al.*, 709 F.Supp. 815 (N.D.Ill.1989). In relevant part, that opinion held that (1) the Foundation's complaint

failed to meet Rule 9(b)'s particularity requirements respecting plaintiff's claim for churning, and (2) violations of those rules promulgated by the Commodity Futures Trading Commission ("CFTC") do not create private rights of action. Having so dismissed plaintiff's federal claims, the court moved pursuant to *Blau Plumbing, Inc. v. S.O.S. Fix–It, Inc.,* 781 F.2d 604, 611 (7th Cir.1986), and declined to exercise pendent jurisdiction over the remaining state claims. The Foundation has subsequently amended its complaint to cure the Rule 9(b) difficulties and the litigation continues.

## DISCUSSION

Plaintiff submits twelve claims for relief in his complaint: violations of sections 4b and 4o of the Commodity Exchange Act ("CEA"), violations of the Commodity Futures Trading Commission ("CFTC") Rules 166.3 and 1.55, fraudulent concealment and misrepresentation, constructive fraud, negligence, negligent misrepresentation, breach of contract, rescission and civil conspiracy. After grouping related issues, we discuss these claims below.

### I. *Private Remedies for CFTC Rules*

■ Defendants allege there is no private cause of action for violations of rules promulgated by the CFTC and that therefore claims three and four should be dismissed. Because we adopt the portion of Judge Leinenweber's *Foundation* opinions that pertain to this issue, we effectively agree.

Given the particular circumstances of this case, there is no need for two district court judges sitting five floors apart to render separate opinions on this issue. We first note the complaints in these two cases closely track each other: the same defen-

dants, one plaintiff's decision to invest influenced by the other's earlier success, claims for relief being identical, *et cetera.* The parties in each dispute have also enlisted the services of the same lawyers.

A second opinion on the private remedy issue from another district judge in the same circuit, applying the same facts,[3] would therefore not likely serve any purpose. We have never before evaluated the private cause-of-action question with respect to CFTC rules and, therefore, we bring only those same arguments counsel have marshalled before Judge Leinenweber to the table. Further, a separate decision by us would have little practical effect. In the event this court differed with Judge Leinenweber and found a private remedy, our disagreement would be consolidated and appealed together. If we agreed, nothing more would come of it.

Therefore, the appropriate course is to adopt the portion of Judge Leinenweber's opinion dismissing claims for relief stemming from violations of CFTC Rules 1.55 and 166.3. *See* 709 F.Supp. at 817–821. There, as here, those allegations were found in claims three and four. Accordingly, we dismiss them here as well.

### II. *Pleading Fraud with Particularity*

We do not, however, cede resolution of the Rule 9(b) questions to Judge Leinenweber. We have visited those issues quite frequently and have on occasion evaluated dismissal motions respecting churning allegations similar to those at bar. Given also that dismissals under Rule 9(b) can be easily cured,[4] we plunge ahead with our own inquiry.

#### A. *Churning*

■ Churning has been defined as excessive trading in an account over which the

---

3. We note only that differences in plaintiffs' legal statuses, and the factual circumstances surrounding each investment, are irrelevant to resolution of the private remedy issue. The factual distinctions between the allegations here and those before Judge Leinenweber will come to the fore later, perhaps at trial. For now, however, they assume subordinate positions in the factual landscape.

4. That appears to be precisely the result of Judge Leinenweber's earlier order. On March 14, 1989, he dismissed the complaint and less than one month later, on April 11, plaintiffs filed their first amended complaint.

broker has control for the primary purpose of generating commissions. *See Yopp v. Siegel Trading Co., Inc.*, 770 F.2d 1461, 1465 (9th Cir.1985). It describes a particular species of unauthorized trading which provides a separate and additional claim when high commission charges stem from an amount of trading that exceeds what is appropriate for the client's investment goals. Such trading, of course, breaches a broker's fiduciary duty. *Id.*

■ The requisite allegations to pleading churning in a commodities account mirror those for securities transactions. While courts do not apply a single test or formula, we have embraced three requirements. A plaintiff must show that

(1) broker control of the account, and (2) excessive trading of the account which was (3) intentional or willful, *i.e.*, for the purpose of generating unnecessary commission or at least with reckless disregard for the client's interest.... Usually the intent or recklessness will be implicit in the nature of the conduct.

*Evanston Bank v. Conticommodity Services, Inc.*, 623 F.Supp. 1014, 1024 (N.D.Ill. 1985), (citing *Yopp*, 770 F.2d at 1466, applying *Mihara V. Dean Witter & Co.*, 619 F.2d 814 (9th Cir.1980); *Costello v. Oppenheimer & Co.*, 711 F.2d 1361, 1368 (7th Cir.1983); *Armstrong v. McAlpin*, 699 F.2d 79, 91 (2d Cir.1983)).

■ Defendants contend that the complaint fails to allege (1) facts indicating when trades were made and whether those trades involved commodities, and (2) facts sufficient to ascertain the applicable turnover ratio or percentage of the account value paid in commission. Before we evaluate these particular alleged inadequacies, we note generally that defendants are in the best position to submit answers to the very questions they offer and will have a concrete opportunity to reallege their claims after discovery. Judge Kaufman, of the Second Circuit, framed the position as follows:

Appellees have at their disposal the means to trace the history of Saxe's account. Moreover, the specificity of the allegedly excessive trading, in contravention to Saxe's investment objectives, can be developed at the summary judgment stage or at trial. Accordingly, we believe the parties should be permitted to proceed to discovery. *See Bowman v. Hartig*, 334 F.Supp. 1323, 1326–27 (S.D. N.Y.1971). Once discovery is complete, however, there may remain no claim for relief and summary judgment may be pursued, if appropriate. *See A.T. Brod v. Perlow*, 375 F.2d 393, 398 (2d Cir. 1967), 375 F.2d at 398. Accordingly, we reverse the dismissal of Saxe's churning claim.

*Saxe v. E. F. Hutton & Co., Inc.*, 789 F.2d 105, 112 (2d Cir.1986).

Given this backdrop, defendants' Rule 9(b) contentions cannot stand. The complaint describes a series of trades between May and October 1986. It delineates the composition thereof, predominantly S & P 500 and T–bonds, and contends that the trading was dominated by short-term positions. It is quite predictable that, at this stage, the complaint does not contain facts sufficient to ascertain the applicable turnover ratio or percentage of the account value paid in commissions.[5] Those calculations not only will be made after discovery but they are not the sole indicia of churning. Other relevant factors include the failure to follow an agreed-upon trading strategy. *See In Re Lincolnwood Commodities, Inc. of California*, [1982–1984 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 21,980 at 28,248–50 (CFTC Jan. 31, 1984) (discussing the various indicia of churning). In fact, turnover ratios are considerably less probative respecting churning in the sale of commodities. *See, e.g., Bieganek v. Wilson*, 642 F.Supp. 768, 771 n. 4 (N.D.Ill. 1986), *judgment vacated on other grounds*, 801 F.2d 879 (7th Cir.1986). ("The turnover rate is a less reliable indicator of churning of commodities than of

5. We parenthetically note that a close reading of the complaint may well reveal sufficient figures to make the relevant calculations. The complaint alleges that 63 trades were executed in

Prince Khalid's account May and October 1986, various loss figures (depending on the method of measurement), *et cetera*.

securities, because commodities are traded far more frequently and held far shorter periods than are securities"). We therefore hold that, for Rule 9(b) purposes, plaintiff's churning allegations are stated with sufficient particularity. To the extent this holding is inconsistent with *Shelley v. Noffsinger,* 511 F.Supp. 687, 692 (N.D.Ill. 1981) ("a statement of facts should be included sufficient to allow for a determination of the turnover ratio in the account and/or the percentage of the account value paid in commissions"), and cases which hold similarly, we respectfully disagree.

### B. *Individual Roles*

■ The question presented here concerns whether the complaint sufficiently delineates the alleged acts of the four named defendants. Defendants submit *Minpeco, S.A. v. Conticommodity Services, Inc.,* 552 F.Supp. 332 (S.D.N.Y.1982), as lead authority for the proposition that

> [i]f [plaintiff] does not have a good faith basis for alleging that the defendants acted monolithically, then each defendant is entitled to notice in the pleadings as to its alleged role in the fraud.

*Id.* at 338–39. We think the complaint provides the requisite notice.

The complaint contends that both corporate defendants, Hutton–London and Hutton–New York, were aware of Serageldin and Beydoun's efforts respecting Prince Khalid's account and did nothing to prevent the alleged infractions. Put succinctly, the complaint contends that the Hutton defendants failed and/or refused to supervise the activity of the individual defendants.

Contending that this tacit approval does not suffice under Rule 9(b), defendants invoke *Hokama v. E. F. Hutton & Co., Inc.,* 566 F.Supp. 636 (C.D.Cal.1983), for the proposition that "plaintiffs will have to al-

lege some sort of conduct beyond mere inaction on the part of the controlling parties." *Id.* at 647. We note first the complete irrelevance of the passage above. The court there held the allegations at issue insufficiently described complicity for "controlling person" liability under § 15 of the Securities Act of 1933 and § 20(a) of the Securities Exchange Act of 1934. 15 U.S.C. §§ 77o, 78t. It comes as no surprise that liability thereunder requires proof that the defendants " 'participated' in the primary violations." *Hokama,* 566 F.Supp. at 647.[6] And while the defendants in *Hokama* were not on the hook for *respondeat superior* liability,[7] plaintiffs here allege the Hutton defendants failed and/or refused to supervise the activity of the individual defendants. As such, we think the corporate defendants have been sufficiently notified.[8]

### C. *Conspiracy*

■ We recognize that conspiracy-to-defraud allegations must also comply with the precepts of Rule 9(b). *See Robison v. Caster,* 356 F.2d 924 (7th Cir.1966). The question presented concerns whether plaintiff alleges with sufficient particularity facts respecting an agreement among the defendants and, further, the role played by each individual defendant. *See generally On/TV of Chicago v. Calumet Electronic Supply, Inc.,* No. 83 C 4072, slip op. at 7 (N.D.Ill. January 3, 1984).

The relevant passage appears to be paragraph 101:

> Prior to May 1986, Defendants, and each of them, knowingly and willfully conspired and agreed among themselves to solicit persons, including HRH Prince Khalid, by concealing material facts and making material misrepresentations in order to open accounts over which they would exercise trading authority for the purpose of generating commissions for

**6.** The court should not have to remind counsel for defendants that, as an ethical matter, the citation of *Hokama* may well have been problematic.

**7.** Defendant Madgett was the president, treasurer, director and 50% shareholder of the corporate general partner. Defendant Consolidated was also a 50% shareholder, and defendant

Frane was president, chairman of the board and a principal shareholder of Consolidated.

**8.** Since plaintiff concedes that the second claim for relief is limited to the individual defendants and Hutton–London (pl. mem. at 30 n. 8), we do not evaluate whether it might also have been brought against Hutton–New York.

themselves without regard to the harm caused such persons, including HRH plaintiff.

Even in the context of notice pleading, that description is too conclusory and therefore does not suffice under Rule 9(b). The more comprehensive allegation in the plaintiff's own memorandum ironically buttresses our holding. Because we hold that the latter description should instead have been alleged in the complaint, we quote the memorandum's account at length:

> The corporate Defendants supplied the facilities to conduct such trading and did not interfere with the conduct of Serageldin and Beydoun, and indeed kept quiet about any perceived problems, until there was a serious possibility in late September 1986 that the Foundation would refuse to deposit funds (and thus the corporate Defendants would be liable to the exchanges for any of deficits in the Foundation's trading accounts). It appears that on the one hand, the corporate Defendants gave free reign to Serageldin so long as it was clear he could generate commissions which inured to the benefit of them all, but once there was a possibility of margin calls which would not be met by the Foundation (which maintained several accounts that collectively were significantly larger than the account of HRH Prince Khalid), the corporate Defendants unilaterally determined to terminate their relationships with the Foundation and with HRH Prince Khalid. Assertion of such authority by the corporate Defendants belies disclaimers of responsibility for the trading activity which created this situation.

(Pl. mem. at 31–32.) This description, devoid of references to the complaint, cannot cure the insufficiently particular conspiracy allegation. "Assertions made in a party's brief, however, simply cannot substitute for allegations that should have been pled in that party's complaint." *Westland v. Sero of New Haven, Inc.*, 601 F.Supp. 163, 166 (N.D.Ill.1985). As such, the twelfth claim for relief, civil conspiracy, is dismissed. We grant plaintiff leave to amend so as to incorporate the more detailed description of the memorandum.

### D. *Alter Ego/Agency*

Defendants also contend that plaintiff cannot merely submit Hutton–New York as the alter ego of the other defendants, but must instead allege facts in support. Defendants claim this deficiency subjects claims one, two, five, six, eleven and twelve to dismissal. We cannot agree.

First, the complaint alleges that Hutton–New York took a more active role. For example, the deposits were made to accounts of Hutton–New York and certain directions concerning the portfolio came from there. Second, the complaint alleges that in other circumstances Hutton–London was the mere instrumentality of Hutton–New York. These allegations have been made with the requisite good faith basis, *see Minpeco*, 552 F.Supp. at 339, and therefore suffice for now. Further factual development, after discovery, is inevitable, and other facts to confirm the present claims are uniquely in the defendants' control. *See Saxe v. E. F. Hutton & Co., Inc.*, *supra.*

### III. *CEA Preemption*

Defendants contend that plaintiff's allegations of constructive fraud, negligence and negligent misrepresentation (claims seven, eight and nine), and prayer for punitive damages, are inconsistent with and therefore preempted by the CEA. The case law, however, makes clear that state common law causes of action and the exemplary damages sometimes awarded therefrom are not preempted.

### A. *State Causes of Action*

■ As a general matter, the establishment of a federal regulatory scheme—even one that comprehensively addresses an important social concern—does not automatically preempt the applicable state common law causes of action. Courts instead must decipher first whether the federal enactment at issue plainly intended to abolish common law rights and, if not, whether their retention would render the regulatory scheme ineffective. *See generally Nader v. Allegheny Airlines*, 426 U.S. 290, 298–

300, 96 S.Ct. 1978, 1984, 48 L.Ed.2d 643 (1976); *Florida Lime and Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 142, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248 *reh'g denied,* 374 U.S. 858, 83 S.Ct. 1861, 10 L.Ed.2d 1082 (1963) ("federal regulation of a field of commerce should not be deemed preemptive of state regulatory power in the absence of persuasive reasons—either that the nature of the regulated subject matter permits no other conclusion, or that the Congress has unmistakably so ordained").

We first quickly evaluate the statute to address the first area of inquiry. That avenue, however, is a dead end, for "[n]othing in the Act [CEA] deals expressly with the preemption question." *Kerr v. First Commodity Corp. of Boston,* 735 F.2d 281 (8th Cir.1984).

■ We next evaluate whether maintaining state common law causes of action would render the regulatory scheme ineffective. The CEA is certainly a comprehensive effort—what one court has called an "ambitious scheme for the regulation of commodities trading." *Kerr v. First Commodity Corp. of Boston,* 735 F.2d at 288. It is therefore not surprising that some uncertainty remains over the degree to which the CEA preempts state *regulation.* Courts usually permit suits brought under general state anti-fraud statutes, *see, e.g., McCarthy v. Paine Webber, Inc.,* 618 F.Supp. 933, 943 (N.D.Ill.1985) ("[t]here is no logical reason not to permit the range of traditional common law actions to be expanded by state statute, so long as the Act's regulatory scheme is not impaired"), but usually consider claims brought pursuant to state securities or commodities acts preempted. *See, e.g., Witzel v. Chartered Systems Corp. of N.Y.,* 490 F.Supp. 343, 347 (D.Minn.1980) ("plaintiff's claim under the Minnesota Securities Act (Count 15) is preempted as the state securities statutory scheme contemplates state agency involvement and regulation"). The latter cases often contend that Congress sought to avoid the dual regulation in the futures industry that state Blue Sky laws presently create with respect to securities.

The issue here, however, is separate. While the CEA may well prohibit state *regulation* of the commodities field, that finding does not compel the preemption of state *common law claims.* We consider the state law claims here closer in kind to those brought pursuant to the general state anti-fraud provisions. Those suits allege particular violations of rather broad-based prohibitions. For example, Judge Shadur's opinion in *McCarthy v. Paine Webber, Inc., supra,* evaluated claims of cheating and defrauding with respect to various trading positions under the Illinois Consumer Fraud and Deceptive Business Practices Act, Ill.Rev.Stat. ch. 121½ ¶ 262. The common law allegations here are quite similar. They reflect alleged violations of legal norms of general applicability.

That those standards of conduct were not legislatively codified is irrelevant. In fact, common law norms are much further from the sort of state regulation courts consider preempted than are state anti-fraud statutes. The court in *Pettigrew v. Oppenheimer & Co., Inc.,* 582 F.Supp. 98 (D.Mass.1984) echoed this reasoning. Judge Skinner therein held that the Massachusetts consumer protection statute could be applied to commodities futures trading because the claims brought thereunder stated essentially the same cause of action as common law misrepresentation or breach of contract—claims he considered obviously not preempted. *Id.* at 101.

Several courts have echoed our holding. *McCarthy v. Paine Webber, Inc., supra,* permitted common law fraud claims. *Mallen v. Merrill Lynch Futures, Inc.,* 623 F.Supp. 203 (N.D.Ga.1985) allowed common law fraud, negligence and breach of fiduciary duty claims, and *Pettigrew v. Oppenheimer & Co., Inc., supra,* referred to a "consensus that the Act does not preempt state common law claims, such as fraud, contract, and tort." 582 F.Supp. at 100.

Defendants allege that certain of plaintiff's state law claims must be preempted as they specify differing standards of care than the CEA. They similarly contend this criterion explains why certain statutory claims were not held preempted by the

CEA. For example, the Illinois statute at issue in both *McCarthy v. Paine Webber, Inc., supra,* and *McGee v. Gerstenberg & Company, Inc.,* [1986–1987 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 23,100 (N.D. Ill. March 24, 1986) requires proof of fraud consistent with the CEA. Defendants' standard for ascertaining when preemption is appropriate, while colorable, is not the law.

We instead must ascertain whether the nature of the conflict permits "no other conclusion" besides preemption. *Florida Lime and Avocado Growers, Inc. v. Paul, supra* 373 U.S. at 142, 83 S.Ct. at 1217. With that standard in mind, preemption would be inappropriate here. That state common law proscribes certain behavior considered legal under the CEA is not dispositive. The federal interest may well extend only to regulating certain types of activity, *e.g.,* only behavior with the requisite scienter. In such circumstances, states would be free to further their own interests by proscribing even more conduct, *e.g.,* negligent actions. *Cf. Oregon v. Hass,* 420 U.S. 714, 719, 95 S.Ct. 1215, 1219, 43 L.Ed.2d 570 (1975) ("... a State is free *as a matter of its own law* to impose greater restrictions on police activity than those this Court holds to be necessary upon federal standards") (emphasis in original); Brennan, *State Constitutions and the Protection of Individual Rights,* 90 Harv. L.Rev. 489 (1977) (encouraging state courts to extend to their citizens, via state constitutional provisions identical to those of the federal constitution, greater protections than the Supreme Court has afforded).

Courts do, however, draw the line where states require behavior prohibited by federal enactments. There, preemption would be compelled, but here, we face no such difficulty. To the extent that this holding is inconsistent with the Florida circuit court's holding in *Poncy v Shearson Lehman Brothers, Inc.,* [current] Comm.Fut.L. Rep. (CCH) ¶ 24,059 (Cir.Ct.Fla. December 30, 1987), we respectfully disagree.

Defendants' supplemental authority, *viz.,* the legislative history of the 1974 Commodity Futures Trading Commission Act, Pub.L. 93–463, 88 Stat. 1389, is not contrary to our holding. Defendants' invocation of *Rice v. Board of Trade of City of Chicago,* 331 U.S. 247, 67 S.Ct. 1160, 91 L.Ed. 1468 (1947), borders on misleading. As support for their preemption argument, they characterize *Rice* as definitive authority, holding "Sections 4b and 4c would preempt state law governing the conduct proscribed by those sections were it not for a savings clause included in Section 4c. *Id.* at 255, 67 S.Ct. at 1164." Our review of that decision, even of that page, differs considerably. The *Rice* holding is perfectly consistent with our holding above, that, but for the then existing savings clause, the CEA would have preempted state *regulation.* A few excerpts suffice:

There is other intrinsic evidence that Congress did not preclude state *regulation* which supplements or bolsters the federal scheme.... Federal regulation in those fields would therefore almost certainly conflict with state *laws.* Thus the provision in § 4c serves the function of preventing supersedure and preserving state control in two areas where state and federal *law* overlap. Where Congress used such care to preserve specific state authority, even when it duplicated federal *regulation* .... Moreover the provision in § 12 of the Act that the Secretary "may cooperate with any department or agency of the Government, any State ... or political subdivision thereof" supports the inference that Congress did not *design a regulatory system which excluded* state *regulation* not in conflict with the federal requirements.

*Rice,* 331 U.S. at 255, 67 S.Ct. at 1164 (emphasis added). Not only do the references to laws and regulations make clear that state common law causes of action were not contemplated, but, also, we know of no field in which the secretary of any administrative agency is directly afforded the opportunity to consult with state officials to delineate common law causes of action.

The legislative history surrounding the 1974 repeal of the savings clause is, again, perfectly consistent with our preemption discussion. Senator Curtis certainly re-

pealed § 4c with a vengeance, but his actions and beliefs cannot alter the scope of provisions the legislation left undisturbed. Further, his attempt "to assure that Federal preemption is complete," 120 Cong.Rec. 30,464 (September 9, 1974), again, does not directly address the continued validity of state common law causes of action. As a theoretical matter, Congress probably could constitutionally implement the sort of scheme defendants contend presently exists—a system where federal legislation preempts both state regulation and common law relief. We merely hold herein that Congress has not as yet done so.

### B. *Punitive Damages*

■ Whether punitive damages are preempted is merely another application of the same general principles. The Eighth Circuit, in *Kerr v. First Commodity Corp. of Boston*, summarized the point that

> the continued existence of common law fraud actions permitting punitive damage awards does not conflict with the regulatory scheme established by the [Commodities Exchange] Act.

*Supra*, 735 F.2d at 288. That court explicitly adopted the holding of the Ninth Circuit in *Kotz v. Bache Halsey Stuart, Inc.*, 685 F.2d 1204, 1207–08 (9th Cir.1982), and described the latter case as having expressly recognized the "continuing availability under state law of punitive damages for commodities fraud," 735 F.2d at 288. Other district courts have followed this same reasoning. *See, e.g., Dorsey v. E.F. Hutton & Company, Inc.*, [1986–1987 Transfer Binder] Comm.Fut.L.Rep. ¶ 23,073 (N.D. Fla. May 10, 1986). We agree and similarly permit punitive damages as relief for state common law claims.

Defendants' contention here derives from the language of the CEA. They contend 7 U.S.C. § 25(a)(1) limits relief to "actual damages." In context, however, the meaning of that provision remains limited to relief for violations of the CEA and thereby suits brought under it. In relevant part, the section provides:

> § 25. Private rights of action
> (a) Actual damages; actionable transactions; exclusive remedy
> (1) Any person (other than a contract market, clearing organization of a contract market, licensed board of trade or registered futures association) who violates this chapter or who willfully aids, abets, counsels, induces, or procures the commission of a violation of this chapter shall be liable for actual damages....

*Id.* This limitation applies only those damages recoverable pursuant to the CEA claims and has no effect on pendent state causes of action. We therefore recognize that plaintiffs cannot secure punitive damages for churning in violation of CEA sections 4b and 4o. Defendants urge us to read § 25(a)(1) to subordinate a state's interest in employing punitive damages to deter certain behavior. In the absence of clear evidence of congressional intent, *see supra*, we cannot read this section so broadly. Plaintiff's claim for punitive damages respecting his state common law causes of action is therefore permissible.

### IV. *Punitive Damages*

Our resolution of the preemption dispute leaves defendants' claim that Hutton–New York cannot be subject to punitive damages because it was nothing more than an inactive participant. That contention, while persuasive, cannot govern our ruling at this time.

The justification for imposing punitive damages parallels that for criminal penalties: to punish and deter undesirable conduct. In Illinois, as in other states, "punitive damages are awarded as a punishment to the wrongdoer and as a means to deter the particular defendant and others from committing like offenses in the future." *Tolle v. Interstate Systems Truck Lines, Inc.*, 42 Ill.App.3d 771, 773, 1 Ill.Dec. 437, 439, 356 N.E.2d 625, 627 (5th Dist.1976).

Where an otherwise innocent corporate defendant's liability solely derives from *respondeat superior*, an interesting question has arisen over whether the above justifications still apply. Some courts have followed a vicarious liability rule holding the principal liable whenever and for whatever the agent is culpable. *See, e.g., D. L. Fair*

*Lumber Co. v. Weems*, 196 Miss. 201, 16 So.2d 770 (1944); *Sovereign Camp, W.O.W. v. Roland*, 232 Ala. 541, 168 So. 576 (1936). Others have followed a complicity rule under which the corporate principal becomes liable for punitive damages only where officers have ordered, ratified, or participated in outrageous misconduct. *See, e.g., Stewart v. Potter*, 44 N.M. 460, 104 P.2d 736 (1940); *Roginsky v. Richardson–Merrell, Inc.*, 378 F.2d 832 (2d Cir. 1967).

Illinois courts appear to have embraced the second approach. In rejecting vicarious liability for punitive damages, the Fifth District argued:

> The ability to better control the actions of the employee through greater supervision is often illusory. As in the instant case, employees may perform their duties where direct supervision is impossible. Further, increased supervision may well be ineffective to prevent the occurrence of certain torts for which punitive damages may be assessed. Thus society's interest in the preservation of the social order through punishment and deterrence may frequently not be advanced when punitive damages are assessed vicariously against the corporate master.

*Tolle v. Interstate Systems Truck Lines, Inc.*, 42 Ill.App.3d at 773, 1 Ill.Dec. at 439, 356 N.E.2d at 627. And this contention would appear particularly applicable to Hutton–New York, whose ability to supervise an employee based in London would be considerably less than that contemplated by the *Tolle* court.

The operative test follows:

> Punitive damages can properly be awarded against a master or other principal because of an act by an agent if, but only if:
>
> (a) the principal authorized the doing and the manner of the act, or
>
> (b) the agent was unfit and the principal was reckless in employing him, or
>
> (c) the agent was employed in a managerial capacity and was acting in the scope of employment, or

> (d) the principal or the managerial agent of the principal ratified or approved the act.

*Mattyasovszky v. West Towns Bus Co.*, 61 Ill.2d 31, 330 N.E.2d 509 (1975) (citing *Restatement of Agency 2d*, 217C, *quoted in Tolle*, 42 Ill.App.3d at 774, 1 Ill.Dec. at 439, 356 N.E.2d at 627). We apply those standards to the facts alleged in the complaint.

█ Plaintiff alleges in his complaint that all of the trading was accomplished through Hutton–U.S., that Hutton–U.S. was aware of what Sergeldin was doing, that Hutton–U.S. allowed trading to continue even though the trading in the account subjected it continually to margin calls and that Hutton–U.S. forced the liquidation of the account for no apparent reason. This activity more than suffices to constitute authorization of the doing and manner of the act, as well as ratification and approval thereof. In addition, the allegations move beyond indirect liability by alleging that Hutton–U.S. forced the liquidation. That behavior suffices at this stage without respect to the potential indirect liability arising from Serageldin's acts.

The complaint's allegations do provide a basis for punitive damages against Hutton–New York and therefore those claims against it cannot be stricken.

## V. *Negligent Misrepresentation*

█ Defendants allege that because Prince Khalid does not allege his affairs with third parties were affected by information he obtained from the defendants, the negligent misrepresentation claim (claim nine) must be dismissed. We disagree both as to the content of the allegations and to the relevant law and, therefore, deny the motion to dismiss claim nine.

All agree that the Illinois courts have embraced the formulation of negligent misrepresentation contained in the Restatement (Second) of Torts, Section 582 (1977). *See generally Black, Jackson and Simmons Insurance Brokerage, Inc. v. International Business Machines Corp.*, 109 Ill.App.3d 132, 135, 64 Ill.Dec. 730, 732, 440 N.E.2d 282, 284 (1st Dist.1982). The Re-

statement implicitly delineates the requisite elements in the following passage:

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for the pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

Restatement (Second) of Torts, Section 582 (1977). The legal dispute here concerns whether "for the guidance of others in their business transactions" should be interpreted to limit the tort only to those misrepresentations affecting relations with third parties. Defendants answer affirmatively and plaintiff disagrees.

We first note that the legal dispute is probably irrelevant because the complaint satisfies the third party requirement. The negligent misrepresentation claim incorporates the earlier allegations of churning and other fraud in commodities transactions (cplt. at ¶ 90). Those transactions were not conducted *with* Hutton but rather *through* it. Hutton executes *trades* whereby its client, here Prince Khalid, either purchases or sells commodities to another. Though the other transactor remains anonymous, whether an institution, fund or individual, it still represents a third party within the meaning of the negligent misrepresentation tort. Put simply, defendants' contention oversimplifies the transactions at issue.

In an abundance of caution we also invoke those decisions which have refused to dismiss negligent misrepresentation claims in circumstances similar to these. Judge Aspen, in *Zahorik v. Smith Barney Harris Upham & Co.*, 664 F.Supp. 309 (N.D.1987), for example, addressed the purported third party requirement and held that the defendants had sufficiently alleged the tort merely by having pleaded that the defendant's business was to supply information for use in business transactions. *Id.* at

313–14. Judge Aspen first noted that those Illinois cases which appear to require an allegation as to third parties, do not actually specify a separate element. *Id.* He subsequently explained that requiring third party allegations oversimplifies a complex issue as to the relationship between the supplier and the recipient of information. Because we agree so wholeheartedly, we quote his explanation at length:

> In our view, Smith Barney and these courts focus unnecessarily on the "third party" language. A more helpful description of the negligent misrepresentation elements would emphasize that the defendant must not simply be in the business of supplying information for the guidance of others in their business transactions, but also that the defendant must have been engaging in that activity with the plaintiff at the time the suit arose. For it is the relationship between the plaintiff and defendant which creates the necessary duty under tort law.... Of course, if the relationship between the plaintiff and defendant is in the context of the defendant's information supplying business, a third party will usually be involved but that is not the element which creates the duty. Thus, we believe that the existence of a third party is implicit in the requirement that the defendant be in the business of supplying information for the guidance of others in their business transactions and that the defendant's relationship with the plaintiff is in the context of that business.

*Id.* at 314. We embrace this formulation in its entirety.

The cases cited by defendants are not to the contrary. Many of them adjudicated whether claims for negligent misrepresentation could be *maintained* by third parties. *Greycas, Inc. v. Proud*, 826 F.2d 1560 (7th Cir.1987), *cert. denied*, — U.S. —, 108 S.Ct. 775, 98 L.Ed.2d 862 (1988), for example, involved a suit brought by a company that had lent money to a third party in reliance on the defendant's opinion

letter written for his client. *Id.* at 1562.[9] The same procedural posture describes *Oldenburg v. Hagemann,* 159 Ill.App.3d 631, 111 Ill.Dec. 329, 512 N.E.2d 718 (2d Dist. 1987), *appeal denied,* 118 Ill.2d 546, 117 Ill.Dec. 226, 520 N.E.2d 387 (1988) (subcontractor's third party complaint against architect hired by principal contractor). Others, including *Mutuelle Generale Francaise Vie v. Life Assurance Company of Pennsylvania,* 688 F.Supp. 386 (N.D.Ill. 1988), merely echo the existing formulation. Still others did not even reach the issue and dismissed the claim. *See Rankow v. First Chicago Corp.,* 678 F.Supp. 202, 205 (N.D.Ill.1988), *rev'd.* 870 F.2d 356 (7th Cir.1989) ("the defendant, a bank, does not engage in the business of supplying information"); *see also Black, Jackson and Simmons Insurance Brokerage, Inc.,* 109 Ill.App.3d at 136, 64 Ill.Dec. at 732, 440 N.E.2d at 284 ("Neither of the defendants in the case at bar was in the business of supplying information"). Being persuaded instead by Judge Aspen's view in *Zahorik v. Smith Barney Harris Upham & Co., supra,* we accordingly deny defendants' motion to dismiss the negligent misrepresentation claim (claim nine).

## VI. *Breach of Contract*

Defendants here contend they are entitled to a more definite statement of claim ten's breach allegation because the complaint does not specify the events which purportedly caused the breach, nor identify the parties thereto or terms thereof.

Pursuant to *American Nurses Association v. State of Illinois,* 783 F.2d 716, 725 (7th Cir.1986), defendants claim they cannot effectively grasp the allegations charged and therefore bring their motion for a more definite statement. We separately evaluate each uncertainty submitted by the defendants, and begin with the relevant parties.

■ Paragraph 94 succinctly states sufficient allegations respecting Hutton–London:

> Defendant Hutton London agreed to provide advice to HRH Prince Khalid concerning the funds it entrusted to Defendant Hutton London for investment. Hutton London agreed that the agreement entered into between the parties encompassed the promise Hutton London would safeguard HRH Prince Khalid's investment and that its employee Serageldin would exercise his trading discretion conservatively in the same manner as Defendants traded the accounts of the Foundation. By its acts described above, Defendant Hutton London materially breached its contractual obligation.

That passage recites the relevant agreement, the contents thereof, and the parties thereto. The preceding paragraph's incorporation of the earlier allegations does not render the latter any less explicit, but does suffice in alleging the time, place and persons involved. Similarly, that incorporation does not run afoul of the short and plain statement requirement of Rule 8(a)(2). Because it details the contract claim against one of the several defendants, ¶ 94 actually represents the exact type of allegation sought by cases such as our own. *Morgan v. Kobrin Securities, Inc.,* 649 F.Supp. 1023, 1026–27 (N.D.Ill.1986). As such, the motion for a definite statement respecting Hutton–London's alleged contract with Prince Khalid is denied.

---

**9.** In his discussion of more recent Illinois cases, Judge Posner describes that law in a way quite similar to Judge Aspen's formulation which we herein adopt:

> They [the later Illinois cases] hold that "one who in the course of his business or profession supplies information for the guidance of others in their business transactions" is liable for negligent misrepresentations that induce detrimental reliance.... Where there is a practical as distinct from a merely semantic difference between this formulation of the duty limitation and that of *Pelham* [v. Griesh-

eimer, 92 Ill.2d 13, 440 N.E.2d 96, 64 Ill.Dec. 544 (1982) (eliminating the privity of contract requirement for professional liability)] may be doubted but cannot change the outcome of this case. Proud, in the practice of his profession, supplied information (or rather misinformation) to Greycas that was intended to guide Greycas in commercial dealings with Crawford. Proud therefore had a duty to use due care to see that the information was correct. He used no care

*Greycas, Inc. v. Proud,* 826 F.2d at 1565.

We do, however, grant defendants' motion respecting the other defendants. With reference to them, the complaint is considerably more garbled. As to the other defendants, the complaint lacks allegations succinctly stating the individual claims of breach. Other than the general incorporation of the preceding paragraphs, ¶ 96 contains the only mention of defendants other than Hutton–London:

> By reason of the foregoing, and as a direct and proximate result of Defendants' conduct, and each of them as alleged herein, HRH Prince Khalid was damaged as alleged in Paragraph 56 hereof and elsewhere.

(Cplt. ¶ 96.) That allegation remains far too indefinite for even notice pleading under *Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). These other defendants can only guess to what conduct and contract(s) this allegation refers. The individual defendants cannot be expected to respond to allegations this vague which merely employ the word "defendants." *See generally Bower v. Weisman*, 639 F.Supp. 532, 538 (S.D.N.Y.1986) ("These paragraphs employ the term 'defendant' without specifying which particular defendant is referred to. Obviously Weisman cannot effectively respond to Bower's complaint until he knows which claims Bower is asserting against him in his individual capacity"). Absent a separate paragraph containing allegations respecting each defendant individually, general incorporation of the prior allegations cannot suffice. We therefore grant the motion for a more definite statement respecting defendants Hutton–New York, Serageldin and Beydoun.[10]

VII. *Motion to Strike*

Defendants last allege that the references to the Foundation and the lawsuit between it and these same defendants (¶¶ 12, 15, 22–26, 33, 38 and 41, and parts of ¶¶ 27, 28, 34, 37 and 42) should be stricken as irrelevant and prejudicial. We separately address these two distinct issues.

We have considerable discretion in deciding these issues and, as a general matter, motions to strike "redundant, immaterial, impertinent, or scandalous" matters under Rule 12(f) are disfavored. *See, e.g., United States v. Articles of Food*, 67 F.R.D. 419, 421 (D.Idaho 1975); *see also* 5 Wright & Miller, Federal Practice and Procedure ¶ 1382 at 807 (1969). As such, the standard employed to decipher pertinence and materiality questions is whether or not the "allegations have no possible relation to the controversy." *Id.* at 809; *see also Morrow v. South*, 540 F.Supp. 1104 (S.D. Ohio 1982). And to ascertain the parameters of "scandalous," we question whether the allegations " 'reflect cruelly' upon the defendant's moral character, use 'repulsive language' or detract from the 'dignity of the court.' " *Skadegard v. Farrell*, 578 F.Supp. 1209, 1221 (D.N.J.1984) (quoting 2a Moore's Federal Practice ¶ 12.21 at p. 2426).

We do not think the pending motion is even close. Surely the activity involving the Foundation's account provides background for how and why Prince Khalid came to do business with the defendants. That those allegations have been recited verbatim from the complaint in the Foundation litigation is irrelevant. This background development helps us to decipher the legal relationship between the defendants and Prince Khalid. *Cf. In Re Jarvis*, No. 80 C 4049, slip op. at 3–4 (N.D.Ill. February 11, 1981) ("statements as to the relationship among defendants appear to be normal 'background' material, serving as a foundation for setting forth other pertinent information"). For example, Prince Khalid allegedly agreed to allow Serageldin to trade his account only after the apparent success of the Foundation's account.

Even were this court to employ some sort of prejudice standard, defendants cannot seriously claim the references to the

---

10. This is not to say, however, that Serageldin and/or Beydoun, as employees of Hutton–London, may not have proximately caused that firm to breach. We limit our holding here to whether or not the defendants Hutton–New York, Serageldin and Beydoun breached a contract to which they themselves were a party.

Foundation litigation run afoul of Rule 12(f). Both sides have alluded to that case. In fact, defendants' counsel brought Judge Leinenweber's opinion to this court's attention in a messengered letter dated March 23, 1989. No doubt, because the *Foundation* opinion resolved the then pending issues to the satisfaction of the defendants, the letter stated that "[m]any of the issues involved in the *Khalid Bin Alwaleed Foundation* case are similar to those involved in the captioned case." Whether this communication was required or not, additional references to the *Foundation* litigation do not create additional prejudice.

We do not read Rule 12(f) to be without relevance to litigation in general. Rather, we confidently hold that the motion here does not raise issues which demand judicial action thereunder.

## CONCLUSION

For the foregoing reasons we grant defendants' motion to dismiss claims for relief numbered three (17 C.F.R. § 166.3), four (17 C.F.R. § 155), and twelve (civil conspiracy), deny defendants' entire motion to strike, grant in part and deny in part defendants' motion for a more definite statement respecting claim for relief ten (breach of contract), and deny defendants' motion to dismiss claims for relief numbered one (§ 4b of the CEA), two (§ 4o of the CEA), five (fraudulent concealment), six (fraudulent misrepresentation), seven (constructive fraud), eight (negligence), nine (negligent misrepresentation) and eleven (rescission).